Nicholas A. **PALMIGIANO** et al.

v.

J. Joseph **GARRAHY** et al.

Thomas R. **ROSS** et al.

v.

J. Joseph **GARRAHY** et al.

**Civ. A. Nos. 74–0172, 75–0032.**

United States District Court,
D. Rhode Island.

Feb. 22, 1979.

Robert Mann, Providence, R. I., Matthew L. Myers, Alvin Bronstein, Edward Koren, all of the National Prison Project of the ACLU, Washington, D. C., for plaintiffs.

William G. Brody, Asst. Atty. Gen., Providence, R. I., Paul L. Foster, Cranston, R. I., Chief Legal Counsel, R. I. Dept. of Corrections, for defendants.

## OPINION

PETTINE, Chief Judge.

█ Plaintiffs' attorneys, employed by the National Prison Project of the American Civil Liberties Union, seek an award of fees in compensation for their successful presentation of a major civil rights class action, wherein the Court ordered the defendants to correct unconstitutional conditions then existing at the Adult Correctional Institution (ACI). The defendants raise their objections to the granting of any award. One of these—that the Eleventh Amendment bans a fee award out of the state treasuries against state officials—can no longer be maintained. *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) clearly sets aside any such state immunity. The other objections are that the requested hourly rates are excessive and unreasonable, and that the equities of the case require a reduction of the amount claimed.

█ The plaintiffs' right to recover a fee under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, is so clearly established that any analysis or extended discussion of this point would be nothing more than an exercise of reiteration. On the other hand, the ultimate determination of the amount of the fee to be awarded requires a close filtering factual analysis of the case through the standards enunciated in *King v. Greenblatt,* 560 F.2d 1024 (1st Cir. 1977), and the teachings of *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974); *Lund v. Affleck,* 587 F.2d 75 (1st Cir. 1978); and *Souza v. Southworth,* 564 F.2d 609 (1st Cir. 1977).

The consolidated class action giving rise to the present controversy was heard by this Court more than a year ago; after a lengthy trial an opinion was rendered on August 10, 1977, in which the Court found, among other things, that the

lack of sanitation, lighting, heating and ventilation, and the noise, idleness, fear and violence, and the absence or inadequacy of programs of classification, education, physical exercise, vocational training or other constructive activity create a total environment where debilitation is inevitable, and which is unfit for human habitation and shocking to the conscience of a reasonably civilized person. *Palmigiano v. Garrahy,* 443 F.Supp. 956, 979 (D.R.I.1977).

The case challenged virtually every aspect of prison life and required more than good legal competency to conduct and manage the pretrial discovery stage successfully and, in the courtroom, develop with probative evidentiary clarity the denouement of prison life at the ACI with all its inhumane unconstitutional aspects. It demanded advocacy at its best. It can be safely said that no case in this courtroom has ever generated more political and public reaction; more than a year later it is still of prime public concern and comment. The undesirability of the case is manifest in the reaction of a great majority of the people and as a consequence with many legislators.[1]

This complex legal and emotional setting is the common denominator for many of the criteria set forth in *King, supra,* each of which will be discussed; however, the final conclusion should be consonant with prior awards by this Court in similar cases, cited *supra,* as reviewed by the appellate court, to the end that an evenhanded, logical body of precedents is established.

The right to a fee is firmly established in statutory law. In fact, the Court has already ordered, in its August 10, 1977 decision, that counsel for the plaintiffs be awarded reasonable attorneys' fees. Therefore, I will now consider the controlling criteria and the amount of the award.

1. This statement is based on the newspaper publication of the comments of various legislators and certain others of the general public. The long history of prisoner trials in this Court has given rise to more than a passing reaction in the past. The coercive nature of the Court's orders is not easily accepted by the legislative and executive branches of this government. At one point, it was reported that thirteen state senators joined in a resolution that Judge Pettine be impeached for issuing "unconstitutional" orders concerning the prison.

### The Fee Award

In *King v. Greenblatt, supra,* the standards for computing a fee award under 42 U.S.C. § 1988 are:

1) the time and labor required; 2) the novelty and difficulty of the question presented; 3) the skill required to perform the legal services; 4) the preclusion of other employment by the attorney due to acceptance of the case; 5) the customary fee in the community; 6) whether the fee is fixed or contingent; 7) time limitations imposed by client or circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation and ability of the attorney; 10) the undesirability of the case; 11) the nature and length of the professional relationship with the client; 12) awards in similar cases. *Id.,* at 1026-27, describing *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–719 (5th Cir. 1974).

All these criteria will be considered though the defendants did state on the record that they do not question "the competency of Plaintiffs' counsel or the quality of their work", the number of hours for which compensation is sought.[2] (Defendant's memo p. 4.)

*Time and labor required, novelty and difficulty of the questions presented; the skill required to perform the legal services; the experience, reputation and ability of the attorney.*

These factors can best be realized by noting the comprehensiveness of the case which encompassed the totality of prison life in Rhode Island. The unconstitutional conditions attacked were the filth and deterioration of the maximum security building, its unsanitary, inadequate and dangerous plumbing and electric lighting, the intolerable noise level within the section, the inadequate heating and ventilating system—guards and inmates wore heavy coats day and night—the existing fire hazards, deplorable food service—presenting imminent danger to public health—health standards in the infirmary, collapse of the classification process, the rampant fear and violence throughout the prison, the intolerable idleness of inmates for lack of programs, the co-mingling of pretrial detainees and convicted felons, lack of drug abuse programs, deficiencies in medical services which were a threat to the lives of the inmates; in short, the plaintiffs developed their case in all these areas in an institution which, as stated by one expert, had "all the egregious deficiencies that could possibly exist" and as another expert testified was the only prison he ever visited for which he could find nothing good to say. In the August 10th Opinion this Court noted the enormous preparation and presentation required by this case: "After extensive discovery, a trial was held which extended over two weeks. The findings of fact required by Fed.R. Civ.P. 52 are set forth herein and are based on the testimony received at trial, stipulations by the parties and extensive exhibits, including depositions of various officers of the Department of Corrections. The Court's task was made easier by the extensive assistance of experts from various fields of corrections, institutional environmental health and sanitation and correctional psychology". *Palmigiano, supra,* at 960.

It cannot be disputed the case involved a complex, complicated factual situation which required thorough pretrial discovery and study. Especially important was the familiarization with several specialized disciplines, so necessary for the proper presentation of expert testimony. Also required was the correlation and sifting of massive amounts of evidence and the ultimate orderly presentation in the courtroom. The novelty of the questions raised cannot be

---

**2.** In oral argument the assistant attorney general representing the defendants stated that he did not question the actual hours the plaintiffs said "they put in on the case" because it "would be futile to go through cross-examination as to each particular hour. I do question duplicative hours; non-lawyer hours".

It was also stipulated that the Court could accept the affidavits, introduced as exhibits, as being the testimony the individuals would have given had they testified in person.

questioned; though there may be a legion of decisions on various aspects of prison conditions, at the time of this trial the Court could find no other decision covering the entire range of issues raised in this litigation.

The plaintiffs' attorneys are from the National Prison Project and have acquired a superior skill in this area of the law. It is uncontradicted they operate on a national scale and thus have represented prisoners in other states in many important cases involving complex constitutional issues. The recognition of their expertise is evidenced by their teaching, publications and appearances before congressional committees, various state commissions and conferences on corrections.

### Preclusion of other employment

The defendants' argument on this issue is substantially the same as made in *Lund*. They claim this consideration is not relevant because the "National Prison Project is an arm of the privately-funded American Civil Liberties Union [and] its financial ability to maintain this type of lawsuit will not be impaired by a denial or limitations of fees" (defendants' brief). Defendants further contend the Court must take into consideration that the attorneys are salaried employees and thus no award should be made in excess of their salaries, *i. e.*, their entitlement must be nothing more than a percentage of their salary as related to the time spent on this case. This argument concludes that "any amount over the cost incurred by the National Prison Project, the salaries paid out by the National Prison Project would amount to a windfall" (oral argument on briefs).

■ This argument was foreclosed by the First Circuit in *Reynolds v. Cooney*, 567 F.2d 1166 (1977) wherein it stated:

Attorney's fees are, of course, to be awarded to attorneys employed by a public interest firm or organization on the same basis as a private practitioner. *Id.* at 1167.

*Accord, Perez v. Rodriguez Bou*, 575 F.2d 21, 24 (1st Cir. 1978). In spite of this, the defendants press their position arguing that the appellate court has not answered the precise question—limitation of fees to public interest firms by the amount of their salaries. I fail in understanding their interpretation of the words, "on the same basis as a private practitioner." They do not argue that the public interest firms should be paid only the additional difference between their salaries and what a private practitioner would receive. Instead, they flatly state the plaintiffs' attorney should be limited by the ceiling of their salaries. In any event, the Court concludes that both positions are untenable. I find nothing in decisional law or the Congressional history indicating that the losing defendant in a public interest case should gain an advantage by having fees computed differently for public interest firms. Such an approach would surely negate the purpose of "deterring illegal conduct by the losing party and other possible violators" and is at odds with the "private enforcement pattern [existing] in numerous federal statutes mandating fee awards"; nor would it "induce behavior which courts and legislatures find desirable".[3]

The attorneys for the National Prison Project were precluded, because of the time occupied in the prosecution of this controversy, from applying their time on other important civil rights cases. Certainly the National Prison Project has budgetary strictures and the important services it offers have to be allocated as priorities demand. The award of attorneys' fees, all of which goes to the organization, is a means by which representation can be expanded to more litigants in civil rights cases.

■ The very purpose of the statute is to provide fees that are adequate "to attract competent counsel . . ." to the type of complex litigation produced by this case. Senate Report No. 94–1011, 94th Cong.2d Sess. 1976 at 6; U.S.Code Cong. and Admin. News [1976], 5908, 5913. Neither the First Circuit nor any other circuit has ever in-

---

3. *See* Awards of Attorneys' Fees to Legal Aid Offices, 87 Harv.L.Rev. 411 (1973).

cluded a collateral source doctrine in setting forth the controlling criteria in assessing a fee. *See, e. g., King v. Greenblatt, supra; Thompson v. Madison County Board of Education,* 496 F.2d 682, 689 (5th Cir. 1974); *Moore v. Townsend,* 525 F.2d 482, 486 (7th Cir. 1975); *Brandenburger v. Thompson,* 494 F.2d 885, 889 (9th Cir. 1974); *Lea v. Cone Mills Corp.,* 438 F.2d 86, 88, 90 (4th Cir. 1971). Finally, as the Fifth Circuit has stated,

This Court has indicated on several occasions that allowable fees and expenses may not be reduced because appellants' attorney was employed or funded by a civil rights organization and/or tax exempt foundation or because the attorney does not exact a fee . . . Whether the attorney charges a fee or has an agreement that the organization that employs him will receive any awarded attorneys' fees are not bases on which to deny or limit attorneys' fees or expenses. *Fairly v. Patterson,* 493 F.2d 598, 606–7 (1971).

### The contingent factor

The only fee available in welfare litigation is pursuant to 42 U.S.C. § 1988 which, by its very terms, makes such fee contingent on the success of the litigation. Private attorneys have several options: Take the case on a purely contingency basis as provided in the statute and receive payment only if successful, arrange for compensation from the client if unsuccessful, or refuse the case. Only the first option is open to legal services attorneys. They are obligated to represent all the poor and reimbursement is completely contingent on success. *Lund v. Affleck,* 442 F.Supp. 1109, 1116 (D.R.I. 1977), *aff'd* 587 F.2d 75 (1st Cir. 1978).

The plaintiffs urge that since the individual plaintiffs were not obligated to pay any fees, the award should be adjusted upward as an "incentive" award because of the contingency factor. In support they cite *Parker v. Matthews,* 411 F.Supp. 1059, 1068 (D.D.C.1976); *Lockheed Minority Solidarity Coalition v. Lockheed,* 406 F.Supp. 828, 834 (N.D.Cal.1976); *Stanford Daily v. Zurcher,* 64 F.R.D. 680, 685-686 (N.D.Cal.1974); and *Arenson v. Board of Trade,* 372 F.Supp. 1349, 1358 (N.D.Ill.1974).

Certainly the contingency factor is cause for a more liberal application of the consideration guiding a court in awarding a fee; Congress intended, through the fees award act, to encourage civil rights litigation to vindicate important rights guaranteed by law. Further, the American Bar Association canon of ethics permits consideration of the contingent nature of the case when determining a fee. Therefore, a court should consider the contingent nature of a case if the statutory goal of full compensation is to be met. However, the contingency factor should not, as this Court sees it, be analogized to a punitive award.

Legal writers and a number of courts have alluded to the punitive nature of fee awards in these kinds of cases. Even conceding for the purpose of discussion that the coercion of a fee is in the nature of a punishment, the fee award, nevertheless, should not be thought of within the same framework as exemplary or punitive damages.[4] The fee must be measured by the uncertainty of success and be within the bounds of reasonableness. If the probability of success is a virtual certainty or great, it follows the contingent factor diminishes in value. The measure of this value is not subject to a standard formula; rather, it requires the most delicate application of judicial discretion, in order that the amount

---

4. This is not to say that awards in the nature of punishment may not be made in an appropriate case. Punitive and exemplary awards must require consideration of certain traditional factors such as malicious, wanton or oppressive conduct. *See,* such historic teachings as Hale, Damages §§ 87, 88 n.2 (2d ed. 1912); *International Union, United Auto., Aircraft and Agr.*

*Implement Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958). I suppose a skilled advocate might persuasively argue that it should be no different in a civil rights case than in a tort action.

However, I take no position today as to the merits of the foregoing.

ultimately awarded is fair and ethical. *See* Berger, Court Awarded Attorneys' Fees: What is "Reasonable", 126 U.Pa.L.Rev. 281, 326 (1977).

One must remember that no single criterion can be considered in isolation. The statute contemplates reasonable fees. As the First Circuit stated, "[i]t is not enough for the court to multiply a fixed rate by the number of hours claimed. The court must satisfy itself of the overall fairness and reasonableness of the fee under all circumstances." *Lund v. Affleck, supra,* at 77. Reasonableness by its nature is an amorphous standard. Applying such a standard inevitably requires the application of subjective justice; but the contours of any subjective determination must be shaped by the particular objective facts of the case. Considerations of a reasonable fee should not include the bad faith, or obstinacy of the defendant; these elements might be considered separately in a possible award of punitive damages.[5] However, the standards set forth in *King* and *Johnson* are the ingredients to be weighed in the quest for what is just, and none of these standards warrant any punitive considerations.

█ The contingency factor may justify an upgrading; but this element must be applied with care and be directly related to the degree of the uncertainty of success; when added to the computed fee, the total amount must be reasonable and ethical. In our desire to vindicate public wrongs, we have not cast aside ethical considerations that hold adequate compensation is that amount which enables a lawyer to serve his client effectively and at the same time preserves the integrity and independence of the profession; that a lawyer should avoid charges which either overestimate or undervalue his advice and service; and that a client's ability to pay is no reason for an excessive charge, though poverty may well require a lesser charge or none at all. American Bar Association's Code of Professional Responsibility, Ethical Consideration 2–18, Disciplinary Rule 2–106; The Canons of Professional Ethics of the Rhode Island Bar Association, Canon 12. An over-expansive interpretation of the fees award act can only do violence to the legal profession. It is neither romantic or emotional to say that surely part of the lawyers' reward must be in his realizations that in a public interest case he is cast in the role of representing a "great deal more than his own interest", *National Association of Regional Medical Programs, Inc. v. Weinberger,* 396 F.Supp. 842 (D.D.C.1975)—he acts in the nature of a private attorney general vindicating a congressional policy to eradicate a public evil. Though the contingent nature of the case is only one of the many considerations, it all too often is overemphasized to justify an unwarranted request by counsel.

Unfortunately, there does exist a wide discrepancy between fee awards in private antitrust cases (rates averaging $180 an hour) as against those in the area of civil rights (rates averaging $40 an hour) thus making private antitrust cases more attractive. *Berger, supra,* 126 U.Pa.L.Rev. at 310. However, this does not negate the fact that in public interest cases, all too often, it is the public that pays or an educational institution struggling against economic burdens that suffers. There is no question that the wrongdoer should be made to pay; but, on the other side of the coin, there is the overall public service that the defendant renders and this demands greater reserve in assessing an award. As *Johnson* teaches, "[t]he customary fee for similar work in the community" must be considered, 488 F.2d at 718; awarding such a customary rate, and a reasonable contingency amount when warranted, does not diminish attractiveness or discourage enforcement. The benefit of the class is served; a balanced and reasonable fee is not contrary to their interest and will not lose the attraction of competent attorneys. It is sophomoric to conclude that an attorney would not be interested in a $100,000 fee simply because application of a more liberal standard might pay him $200,000. In denying a large incentive "bo-

---

**5.** *See* n.4 *supra.*

nus" or "multiplier," this Court does not place a lower value on a civil rights fee award simply because the case serves a broader public purpose; rather, the Court intends to award full compensation for services rendered without designating an excessive fee or "bonus" that will injure the overall public interest served by the defendants. All these factors must be taken into consideration; the traditional notion of ethics is still viable. Paying a full and fair fee does not mean enforcement of these civil rights statutes is dependent on the charity of competent counsel.

Not in any way minimizing the superior work and accomplishment of plaintiffs' counsel and in no way saying they have overemphasized the contingency element, the Court must conclude that the contingency factor cannot be given great value. The egregious conditions existing in the Rhode Island correctional system could hardly escape condemnation through a judicial declaration of unconstitutionality.

### Customary fee in the community; amount involved and results obtained; awards in similar cases.

The plaintiffs' counsel urge this Court to consider the customary fee for similarly complex civil rights litigation done outside the State of Rhode Island as well as in Rhode Island. The defendants object claiming it is "without foundation", "contrary to the ruling in *King v. Greenblatt, supra*", that nothing "in *King* even hints at the idea that the complexity of the issues and the 'unusualness of the subject matter' . . . should expand to a national level the scope of the community."

The First Circuit in *King* cited with approval and accepted the criteria set forth in *Johnson*, where it is specifically stated that "[t]he reasonableness of a fee may also be considered in the light of awards made in similar litigation within and without the court's circuit", 488 F.2d at 719; it then reviewed cases from their own and other circuits in determining the appeal before them. Furthermore, the *Johnson* court also said that "[a]n attorney specializing in civil

rights cases may enjoy a higher rate for his expertise than others, providing his ability corresponds with his experience." *Id.*

The customary fee in the Rhode Island community was established through the affidavits of three practitioners in this state reciting their own billing rates for similar complex litigation. Mr. Ralph Gonnella recites that his billing rate for similar complex federal litigation is seventy-five ($75.00) dollars to one hundred ($100.00) dollars, "depending upon the complexity of the litigation and the nature of the issues"; Mr. Milton Stanzler, a member of the bar since 1948, states that in his opinion, "a reasonable fee for attorneys involved in complex federal litigation and civil rights litigation having experience of 25 years or more at the bar, would be the sum of $100.[00] per hour"; without impugning their affidavits, the Court must interstitially note that both these attorneys have fee cases pending in this Court. Finally, Mr. Malcolm Farmer III sets forth that based on the hourly rates charged by attorneys in his firm, the "following fees are not inconsistent with the standard in Rhode Island: (I) for an attorney of five years' experience at the bar: $60.00 per hour; (II) for an attorney with seven years' experience at the bar: $70.00 per hour; and for an attorney with twenty-five years' experience at the bar: $85.00 per hour"; he further states that no distinction is made between the time spent in court as against time spent out of court and that, "it would not be inappropriate for a somewhat higher rate to be justified on the basis of the expertise of the attorney" in the area of litigation.

In other circuits we find the following: *Ruiz, et al. v. Estelle, et al.*, C.A. No. 5523 (E.D.Tex.1977), a prisoner civil rights case, awarding $75 an hour using the *Johnson* criteria; *Stanford Daily v. Zurcher*, 64 F.R.D. 680, 684–85 (N.D.Cal.1974), an action involving police misconduct, granting $50.00 an hour—the Court appears to have discounted the higher billing rates because the attorneys were not in their area of expertise and it should be noted that this is a 1974 case; *Guajardo v. Estelle*, 432 F.Supp.

1373 (S.D.Tex.1977), a civil rights prisoner case, awarding lead counsel $115–125 an hour, second counsel $70–80 an hour and third counsel, $50–60 an hour. In the area of antitrust, awards have ranged from a low of $128.00 an hour to $500.00 per hour. *See Arenson v. Board of Trade*, 372 F.Supp. 1349 (N.D.Ill.1974); *TWA v. Hughes*, 312 F.Supp. 478 (S.D.N.Y.1970).

Focusing on prior awards in this Court and on those awarded by the First Circuit, we find that $60.00 per hour was awarded in a prisoner case for services performed in 1974 and $75.00 per hour thereafter, which included fee petition in the District Court. These amounts were upheld by the First Circuit, which reduced to $50.00 an hour the appellate work on the fee issue. *Souza v. Southworth*, 564 F.2d 609 (1st Cir. 1977). However, this bare recitation is misleading because the Court of Appeals did say that the award for the work before this Court was indeed very high and that had it not been for the fact that three appeals had been taken in the suit they would have been tempted to remand the case for reconsideration—it concluded, "[t]he amounts though high cannot be considered unconscionable". In *Lund v. Affleck*, 587 F.2d 75 (1st Cir. 1978), the Court sustained an award of $55.00 per hour and $60.00 per hour recognizing the erosion of the dollar over a five-year period. In *Save Our Sound Fisheries v. Callaway*, C.A. No. 5297 (D.R.I. March 6, 1978, unpublished), brought under the provisions of the Marine Protection, Research and Sanctuaries Act of 1972 and the Federal Water Pollution and Control Act of 1972, this Court awarded a fee of $75.00 per hour to one of the attorneys who had been before the bar twenty years and usually billed at that rate.

■ The awards in other circuits, set forth *supra*, are persuasive but certainly not controlling. In the last analysis the award in this case must be reasonably coextensive with awards made by the First Circuit in other similar cases; such a balancing is necessary for an equitable resolution of the problem at hand. In *Lund*, the appellate court approved an award of $60.00 an hour.

It follows that it must be determined whether the case at issue is more or less complex, etc. than *Lund*. In assessing *Lund* and its companion cases, *Palmieri v. Affleck* and *Inmates of Boys' Training School v. Southworth*, decided in one opinion, this Court said, 422 F.Supp. at p. 1116,

> I find these cases had both novelty and difficulty requiring a high degree of skill for preparation and presentation which these attorneys satisfied to a very high degree. In *Palmieri*, careful legal and factual analysis of United States Supreme Court precedent was required to evaluate the State's position denying factual similarity of the instant case. The complexities involved in these kinds of cases demand the skill of a highly intelligent lawyer. To this Court's knowledge *Lund* was a case of national first impression. *Lund* involved questions of pendent jurisdiction of unconstitutional claims, 28 U.S.C. § 1343; need to reach constitutional challenge, 28 U.S.C. § 2281; class certification and interpretation of the Social Security Act; *Inmates of the Boys' Training School* involved enforcement of thirty-six page decree of detailed procedures to be followed by the defendants on behalf of a class of juveniles.

■ The same is true of this case; however, here there was a two-week trial involving a complex, complicated factual situation involving approximately 700 prisoners in several institutions. The Court quite agrees with the plaintiffs' counsel that it was particularly difficult to identify and prove the constitutional violations. A comprehensive factual record had to be placed before the Court which required testimony from seven nationally-known experts from six different disciplines. Here, unlike *Lund*, the tactical handling of the case needed more mature judgment and skilled advocacy. This was one of the first cases which attacked practically an entire prison operation affecting all inmates, pretrial and convicted; the end result was the promulgation of a sweeping order establishing minimum constitutional standards and implementing for the first time in Rhode Is-

land a special master. The plaintiffs' attorneys needed the utmost skill to present, in a coordinated manner, complex facts. The case had the problems present in *Lund* and more. Striving to adhere to the teachings of our own circuit judges in light of what other circuits have said, I conclude that more than $60.00 per hour, as awarded in *Lund*, is justified here. Exercising my discretion, *King, supra*, 560 F.2d at 1026, I conclude a fair award should be computed on the basis of the following hourly rates:

A) *MATTHEW L. MYERS*—Mr. Myers acted as lead counsel with the prime responsibility for the presentation of all the evidence. He seeks $70.00 an hour. It is true this amount represents a $10.00 per hour increase over the amount approved in *Lund*; it is also true, as already stated by the Court, that this case was more intricate and, unlike *Lund*, involved a lengthy trial requiring intensive preparation and trial presentation. Moreover, the Court is well aware that the effect of inflation during the past year and one-half makes a direct comparison between *Lund* and the present case illusory. Therefore, justice appears to dictate an increase over the rate awarded in *Lund*.

In the final analysis, the overall compensation awarded to each attorney must be fair and reasonable. With regard to Mr. Myers, the Court concludes that a rate of $75.00 for trial time and $70.00 out of court is entirely appropriate. I reject the defendants' argument that it should be less because at the time of the litigation Mr. Myers had only four years' experience. This is not persuasive—the number of years before the bar is not the touchstone that determines the worth of an attorney's fee. "[L]ongevity *per se*, however, should not dictate the higher fee. If a young attorney demonstrates that skill and ability, he should not be penalized for only recently being admitted to the bar"; furthermore, "[a]n attorney specializing in civil rights cases may enjoy a higher rate for his expertise than others, providing his ability corresponds with his experience". *Johnson, supra*, at 719. Mr. Myers is indeed an expert whose expertise and trial experience in many states of this country cannot be questioned.

Out-of-court time requires a lower fee. The First Circuit criticized the application of an across-the-board rate without regard "to the difficulty of the work, the results achieved, and all other relevant factors", *King, supra*, at 1027–1028. This is a difficult issue. I agree that in this case the trial work demands the premium rate which may not be so in other cases, but how much less Mr. Myers should be paid for preparation, with all its demands on legal skills, should not be substantial. However skillfully it was tried, the secret was the intelligence used in developing and welding together all the facts into a cohesive pattern. It seems to me that $70.00 per hour for this work is reasonable and fair.

The Court notes that application of these rates gives rise to a reasonable increase over the rates awarded in *Lund*. Referring to the breakdown of Mr. Myers' hours which is set forth below, the average hourly compensation for his services in this case is $70.39. This 17 percent increase over *Lund* is accounted for by the greater complexity of this case and the 9 percent inflation rate [6] which has prevailed in our economy since the award in *Lund* was made.

B) *ALVIN BRONSTEIN*—Mr. Bronstein is the Executive Director of the National Prison Project of the American Civil Liberties Union Foundation. He has been a member of the bar for approximately 25 years and has vast experience in civil rights litigation; in addition, he is a teacher, lecturer, and writer. His credentials are indeed impressive and it may be said he is one of the foremost national authorities in his field. He seeks $125.00 an hour for his services, which amount more than doubles the rates that have been previously approved in this circuit. Conceding all the

6. Eckstein, O., "The New Reality", Data Resources Review, January, 1979, Vol. VIII, Number 1, p. 1.1.

qualifications Mr. Bronstein possesses, such a dramatic increase cannot be justified in the light of awards in other cases in this circuit and in the interest of overall fairness and reasonableness. The Court does feel, however, that Mr. Bronstein is deserving of a higher hourly rate than Mr. Myers.

Mr. Bronstein's greatest contribution to this case was in a supervisory capacity, where he could draw on the depth of his knowledge and rich experience to give to the preparation of the case the high gloss which was so evident to the Court in the presentation of a complex evidentiary record comprised of testimony on the various specialized fields of corrections, and in the legal arguments articulated so well in pre- and post-trial memoranda. In these endeavors his rate of compensation should be significantly higher than that allowed Mr. Myers. However, Mr. Bronstein's courtroom skill, though of the highest caliber in this Court's experience, was not integral to the successful presentation of plaintiffs' case in light of the commendable effort put forth by Mr. Myers, who acted as lead trial counsel while under the supervision of Mr. Bronstein. Therefore, the Court will set a lesser premium on Mr. Bronstein's in-court work as compared to that of Mr. Myers.

Taking the hourly rates allowed for Mr. Myers' work as a starting point and accounting for unique capabilities of Mr. Bronstein, the Court will allow compensation at the rate of $80.00 per hour in court and $75.00 out of court for Mr. Bronstein.

C) *EDWARD I. KOREN*—Mr. Koren is a staff attorney with the National Prison Project and seeks $75.00 an hour for his services. He was admitted to the District of Columbia bar in 1969 and since that time has had a great breadth of experience in the civil rights area including litigation, directorships of various projects involving prisoners' rights issues, service with the Commission of Corrections for the State of New York and as a writer of several publications in this field.

It is difficult to understand why the plaintiffs' attorneys seek a higher hourly rate for Mr. Koren than they do for Mr.

Myers. Mr. Myers acted as lead counsel in this case, while Mr. Koren's major contribution came from his out-of-court work. Despite Mr. Koren's superior experience, his compensation in this category should not exceed that of Mr. Myers. While he was present in court during the trial of this case, Mr. Koren did not actively participate in the presentation of plaintiffs' case. Therefore, I conclude that $70.00 per hour across the board is a fair rate for Mr. Koren's legal work.

However, it is incumbent upon this Court "to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers but which a lawyer may do because he has no other help available. Such non-legal work may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it." *King, supra,* at 1027. In the analysis of the affidavits, *infra,* this guide is considered. The task was not easy; the legal practice is not subject to a mathematical formula that can be scientifically applied. Mistakes are inevitable; bright line distinctions are not always possible.

As the Court has set forth below, certain of Mr. Koren's hours were spent examining ACI records in search of evidence of incidents of violence at the prison. While Mr. Koren's experience in prison matters may have enhanced his ability to perform this task, the work was essentially non-legal in nature and should be compensated at a rate of $30.00 per hour (see below).

D) *ROBERT MANN*—Mr. Mann served as local counsel and graduated law school in 1973. He has worked with the Rhode Island Legal Services, and since July, 1974 has been in private practice. He has been active in public interest and civil rights litigation, having acted as counsel in a number of cases in Rhode Island. His exposure and experience does not equal that of the other attorneys and his efforts appear to have been primarily that of an assistant. As the attorney for the litigants, he participated in the trial as a co-counsel

but without any appreciable trial work as such, i. e., interrogation and cross-examination of witnesses. This is not to say his court presence wasn't required—he did, indeed, represent the plaintiffs and the Court noted he was active throughout the trial in conferring with the prisoner plaintiffs who were in court and in numerous "counsel table" conferences with Mr. Myers. Here again, the Court feels no distinction can be drawn between in- and out-of-court time. A $60.00 hourly rate is fair and reasonable.

However, Mr. Mann also has sought compensation for work of an investigatory nature, such as checking records at a nearby fire station. For this work the Court will allow a fee of $30.00 per hour because it required neither legal skill nor specialized experience (see below).

In other instances Mr. Mann has sought compensation for mere errand-running, such as picking up people at airports and obtaining copies of depositions. For these hours the Court will allow no compensation.

These hourly rates having been established, the Court scrutinized the affidavits of recorded hours to determine if there was a proper utilization of time or a duplication of effort; it further examined the plaintiffs' work to see if what was recorded was legal work in the strict sense or rather investigative, clerical, compilation of facts and statistics or other work which could have been accomplished by non-lawyers. The Court also took into account the objections set forth by defendants to certain of the entries in plaintiffs' time sheets. Generally, defendants contended that certain hours billed by Messrs. Koren and Bronstein are duplicative and should be disallowed, while other hours billed by Mr. Koren involve work of a non-legal nature and therefore should be disallowed.

After a preliminary analysis of plaintiffs' affidavits and defendants' objections, the Court informed the parties of its concern over the amount of hours billed by plaintiffs' attorneys in several categories into which their work could be broken down. A supplemental hearing was held on January 26, 1979 to discuss these hours. Based on the record and the arguments presented at that hearing, the Court finds as follows with regard to these specific issues:

1) Conference Hours

The plaintiffs' attorneys logged approximately 208 hours in conference, including time spent on the telephone and in communication by letter. The Court reviewed many specific entries of this type at its hearing of January 29 and now finds plaintiffs' entries to be justified. The attorneys approached the preparation and trial of this case in a systematic manner and divided labor among themselves in order to utilize efficiently their resources. In most instances, conferences were held for the coordination of these efforts or for the purpose of exchanging information learned by one attorney but important to another in his area of primary responsibility. In addition, conferences were held during the weeks prior to trial for the purpose of establishing schedules for the presentation of witnesses and contingency plans in the event that the trial's progress indicated that a change in the planned sequence was appropriate. The Court takes note that plaintiffs' evidentiary presentation was coherent and well organized despite its inclusion of expert testimony on every aspect of prison life. This attests to the value of such pre-trial conferences.

Additionally, conferences were held between Mr. Myers, as lead counsel and Mr. Bronstein, as advisor. The Court accepts Mr. Myers' argument that such discussions were valuable to him and to the quality of plaintiffs' case as a means by which he could call on the superior experience and expertise of the Director of the National Prison Project.

For these reasons the Court will allow full compensation for the conference hours logged by plaintiffs' attorneys. In the context of litigation as complex as this, the Court will not penalize plaintiffs' attorneys for taking great care in the presentation of a truly commendable trial record, a record which, in turn, enhanced the accuracy of the Court's findings and the efficacy of the injunctive relief it eventually entered.

## 2) Hours Billed for Tours and Depositions

In several instances Mr. Mann and another of plaintiffs' attorneys seek compensation for their presence at a prison tour or witness deposition. Despite plaintiffs' argument that each attorney contributed to the conduct of the tour or deposition he attended, the Court will allow compensation for only one attorney on each of these occasions. In the computation of fees set forth below, the Court has equalized the burden of exclusion of these hours by deducting one-half of the excluded hours from the total allowed to the attending National Prison Project attorney and the remaining half from the total allowed to Mr. Mann.

## 3) Non-Legal Work

█ The Court will allow compensation for hours spent in meetings and interviews with inmates because these hours may be viewed either as witness preparation or as attorney-client communications. However, the Court will apply a lesser rate to investigatory tasks such as records-checking, and it will allow no compensation for work which may be characterized as "errand running" (see below).

In accordance with the rates and hours allowed as described above, the Court hereby makes the following awards for each of plaintiffs' attorneys:

### MATTHEW L. MYERS

| | | | | | |
|---|---|---|---|---|---|
| Total Hours Requested | | 479.5 | | | |
| less duplicative hours in tours and depositions A | | 16. | | | |
| Total Hours Allowed | | 463.5 | | | |
| in court | 37 hrs. | @ | $75.00/hr. | = | $ 2,775.00 |
| out of court | 426.5 hrs. | @ | $70.00/hr. | = | 29,855.00 |
| Total Award | | | | | $32,630.00 |

### EDWARD I. KOREN

| | | | | | |
|---|---|---|---|---|---|
| Total Hours Requested | | 228. | | | |
| less duplicative hours in tours and depositions B | | 1.75 | | | |
| Total Hours Allowed | | 226.25 | | | |
| in court | 29 hrs. | @ | $70.00/hr. | = | $ 2,030.00 |
| out of court | 157.75 hrs. | @ | $70.00/hr. | = | 11,042.50 |
| investigative | 39.5 hrs. | @ | $30.00/hr. | = | 1,185.00 |
| Total Award | | | | | $14,257.50 |

### ALVIN T. BRONSTEIN

| | | | | | |
|---|---|---|---|---|---|
| Total Hours Requested | | 142.5 | | | |
| Total Hours Allowed | | 142.5 | | | |
| in court | 20. hrs. | @ | $80.00/hr. | = | $ 1,600.00 |
| out of court | 122.5 hrs. | @ | $75.00/hr. | = | 9,187.50 |
| Total Award | | | | | $10,787.50 |

### ROBERT MANN

| | | | | | |
|---|---|---|---|---|---|
| Total Hours Requested | | 515.5 | | | |
| less duplicative hours in tours and depositions C | | 17.25 | | | |
| less hours for non-legal work for which no compensation will be allowed D | | 6.75 | | | |
| Total Hours Allowed | | 491.5 | | | |
| in court | 36.5 hrs. | @ | $60.00/hr. | = | $ 2,190.00 |
| out of court | 438 hrs. | @ | $60.00/hr. | = | 26,280.00 |
| investigative and other non-legal | 17 hrs. | @ | $30.00/hr. | = | 510.00 |
| Total Award | | | | | $28,980.00 |

The Court also will allow an award of costs and expenses, as requested by plaintiffs, in the amount of $352.39 for Mr. Mann and $7,874.40 for the National Prison Project. Thus, the total award to plaintiffs' attorneys may be computed as follows:

### ROBERT MANN

| | |
|---|---|
| fees | $28,980.00 |
| expenses | 352.29 |
| | $29,332.29 |

### NATIONAL PRISON PROJECT

| | |
|---|---|
| Mr. Myers' fees | $32,630.00 |
| Mr. Koren's fees | 14,257.50 |
| Mr. Bronstein's fees | 10,787.50 |
| costs and expenses | 7,874.40 |
| | $65,549.40 |

A This figure represents one-half of the time Mr. Myers spent on a tour or at a deposition with Mr. Mann.

B This figure represents one-half of the time Mr. Koren spent on a tour or deposition with Mr. Mann.

C This figure represents one-half of the time Mr. Mann spent on a tour or deposition with Mr. Mann or Mr. Meyers or Mr. Koren.

D Hours billed for "errand-running".

The Court is well aware that this award to the National Prison Project is more than $11,000 below the total fee requested by the A.C.L.U. attorneys. However, the Court is satisfied that the present award is just and reasonable in light of decisional law under the Attorney's Fees Act, the characteristics of this litigation, and the contributions of each attorney to the successful prosecution of this case.

An order will be prepared entering judgment for the plaintiffs in the amounts set forth above.