Robert PILKINGTON

v.

Joseph J. BEVILACQUA.

Civ. A. No. 77–0190.

United States District Court,
D. Rhode Island.

Aug. 20, 1981.

John M. Roney, Lynette Labinger, Providence, R. I., for plaintiff.

Eileen Cooney, Sp. Asst. Atty. Gen., Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

As directed by the First Circuit Court of Appeals in its remand of this case, 632 F.2d 922 (1st Cir. 1980) the fees awarded by this Court to plaintiff's counsel pursuant to 42

U.S.C. § 1988, C.A. No. 77–0190, Oct. 30, 1979, are reconsidered with "heightened sensitivity [in order to insure] a full and searching review of all elements entering into a proposed fee award of [a] recent former clerk(s)" 632 F.2d at 924.

■ The original action brought by the plaintiff alleged that the termination of his employment infringed his rights guaranteed by the First and Fourteenth Amendments. The plaintiff prevailed, *Pilkington v. Bevilacqua*, 439 F.Supp. 465 (D.R.I.1977), and on appeal the First Circuit affirmed. The plaintiff then moved for an award of attorney's fees, 439 F.Supp. 465, *supra*. An award was made of $34,042.35 to Lynette Labinger, the former law clerk and $21,-403.20 to John Roney, her co-counsel, plus costs and disbursements of $1,829.04. This is the award that was vacated and remanded for further proceedings in keeping with the appellate court's teaching.

It appears to me the appellate court acknowledged it had a case, which on the record, as developed at trial, was free of error.[1] Nevertheless, it remanded because it was concerned that "the attorney [*i.e.* Ms. Labinger] whose fee is the major focus of challenge, so recently held the position of law clerk to the judge making the award."[2]

---

[1] I believe it is fair for me to conclude that the First Circuit recognized the complexity of the case, the effort and time expended by Ms. Labinger, the quality of advocacy practiced by the state, and the record being free of error, therefore the Court stated

> The trial transcript of 850 pages reflected the factual complexity. The legal question was one that had not been settled in this circuit at the time of trial . . .
> [The] plaintiff's brief was "justifiably" lengthy . . .
> [The Court] voiced its opinion that "at a minimum" there might have been meaningful cross examination of plaintiff's counsel on each of the criteria set forth in *King v. Greenblatt* 560 F.2d 1024 (1st Cir. 1977) . . .
> In the light of the limited issues raised by defendants-appellants, the fact that the record was not developed, even as to these, and the wide range of discretion necessarily vouchsafed the trial court in fee awards, we would ordinarily have no difficulty in affirming. *See* 632 F.2d at 923, 924.

[2] Ms. Labinger terminated her clerkship as of August 31, 1976; the case at issue was tried

approximately nine months later in May of 1977; the fee award was made approximately three years and two months from the termination of the clerkship.

Though in this case the mandate that I explore certain areas, to be set forth *infra*, negates any need to analyze what the appellate court deems to be a "recent" law clerk, I feel constrained to venture an analysis as guidance for future cases. As I see it, the appellate court is saying that it matters not how long a time has elapsed from the judge-law clerk relationship to the fee awards hearing; the fee award must be viewed from the context of elapsed time from the date of the severance of the relationship to the date of the hearing of the original case which premised the motion for the fee award. In other words, however objective my frame of mind may be today or was over three years subsequent to the last date of the clerkship, it must retrogress to the date of the original hearing. If it does not, I will fail to have "uppermost . . . in [my] mind the avoidance of creating any impression that former clerks appearing before the court benefit either from inside knowledge or a recent intimacy of association".

*Id.* 924. To overcome the potential of ostensible impropriety I was directed to, *sua sponte* a) prod adverse counsel into exploring all relevant questions, b) cross examine the applicant attorney, c) "and even present(ing) any material evidence", and d) err on the side of conservatism in setting the actual fee.

In this case I am to explore four separate areas:

1) Reasonableness of the time spent by plaintiff's counsel on the post trial memorandum. Counsel requested and was awarded compensation for 149 hours. The Court of Appeals noted that since my findings of fact were far less extensive, I should review the work to "see whether counsel substantially exceeded the bounds of reasonable effort." *Id.* 925.

2) Suitability of the work for para-legals; was any of the work done in compiling the proposed findings of fact of a nature meriting compensation appropriate for para-legal personnel—or less than the maximum hourly rate for out of court work.

3) Duplication of work—was all the work performed by appellee's two attorneys, particularly at trial non duplicative.

4) Make inquiry into the hourly rate and, as I understand the directive of the First Circuit, I must finally determine if the fee award will create the impression of favoritism; if so I must then adjust it to a lower level.

Before embarking on this task I make known my reasons for denying the State's motion that I recuse myself. To begin with I would have preferred and been happy to do so if the Appellate Court had not made it a point to remand the case to me; it stated,

> We deem ourselves unable to make other than the most arbitrary of judgments in this situation. So also would another district judge be at the disadvantage of not having witnessed the work of counsel at the time of performance. We have no doubt that the district court, now having the benefit of our reflections on this rather rare situation, will faithfully apply the rigorous standards of scrutiny we have set forth. *Id.* 925.

On February 17, March 6, and April 9, 1981[3] a hearing was held after remand. I must state that the second go round was no more productive of defendant advocacy than the first; the record today is as sterile as it was originally in its attack on the plaintiff's case. I hasten to add this statement is in no way critical of defendant's counsel. Ingenuity in cross examination by the defense may severely damage the plaintiff's case, but, as a touchstone tests the true purity of precious metals, it may also

---

*Id.* at 924. I conclude the appellate court is saying that in a case which has a chain of hearings, such as this one, "intimacy of association" must be measured as of the date of the original litigation regardless of the span of time from that date to any other subsequent hearing; in this case, the original fee award was over three years later and now it is one month shy of five years later.

3. The parties entered into certain stipulations in open court. These follow:

1) Defendants stipulated to the propriety of awarding the original $1,829.04 in costs and disbursements. (Tr. 1–13)

2) As to legal services rendered by John M. Roney, defendants stipulated that the hourly rates sought—$70/hour out-of-court, $75/hour in-court—are appropriate for all time periods. (Tr. 1–14)

3) As to legal services rendered by Lynette Labinger, defendants stipulated that the same hourly rates—$70/hour out-of-court, $75/hour in-court—are appropriate for all legal services rendered by Labinger from January 1, 1979 forward. (Defendants do *challenge* the use of this rate as to Labinger between April 1977 and December 31, 1978) (Tr. 1–14, 1–16 to 1–17)

4) Defendants do not question the quality of Labinger's performance at trial, or her general competence and reputation in the community, but they do not concede her reputation as an expert in civil rights litigation at the time of trial. (Tr. 1–14 to 1–17)

5) Defendants do *not* claim that there was duplication as a result of the performance and presence of two attorneys for plaintiff at trial. (Tr. 1–15)

6) By written stipulation entered September 10, 1979 and marked at hearing as Px. 1, the parties agreed to rely upon four listed cases as adducing evidence on " 'customary fees charged in the community' for years 1977 to the present". (Generally speaking, evidence in those cases has indicated that the customary fee in the community ranges between $60 and $100 per hour)

emphasize the strength and genuineness of the complaint. As I saw it there wasn't much the defendant's lawyer could do.

### The Hourly Rate

In assessing the questioned fee I awarded Ms. Labinger $75 an hour for in court time and $70 an hour for out of court time. The First Circuit expressed concern as to this rate stating that further inquiry was to be made since counsel's affidavit "candidly" stated that the rate of $75 an hour had existed only since April of 1977. To this Ms. Labinger argues, "the concern expressed by the First Circuit as to Labinger's billing rate is factually misplaced, since it was premised on a misreading of Labinger's affidavit as indicating that the $75 hourly rate had first been established in April 1977." post hearing memorandum at p. 4.

Milton Stanzler, a senior and managing partner in the firm of attorney Labinger, who has had considerable experience in civil rights litigation, testified that based on his experience with the various components which go into a billing rate and Labinger's prior work, the firm established a rate of $75 an hour for her services from the time she joined the firm in September 1976. He further stated that shortly after her arrival she was given sole responsibility to try a civil rights case, *Murray v. Norberg,* 423 F.Supp. 795 (1976), and billed her services at $75 an hour; this was also true as to other civil rights litigation at that time, for which her services were similarly billed.

The state in no way attempts to attack Ms. Labinger's performance at trial—indeed they cannot—but the insinuation of their argument is that in spite of the quality of her work and the complexity of the case, she must be penalized because in the law seniority has its privileges and commensurate benefits over juniors in entitlements to larger fees. This is nothing more than a reiteration of what was urged in the beginning. I could not accept such a position then and I can't do it now. As was stated in *Palmigiano v. Garrahy,* 466 F.Supp. 732, 741 (D.R.I.1979)

This is not persuasive—the number of years before the bar is not the touchstone that determines the worth of an attorney's fee. "[L]ongevity *per se* however, should not dictate the higher fee. If a young attorney demonstrates that skill and ability, he should not be penalized for only recently being admitted to the bar"; furthermore, "[a]n attorney specializing in civil rights cases may enjoy a higher rate for his experience than others, providing his ability corresponds with his experience."

The defendant also contends that in a prior case, *Lamphere v. Brown,* 491 F.Supp. 232 (D.R.I.1979)[4] Milton Stanzler, the aforesaid senior partner, was awarded $70 an hour for out of court time, and in *Palmigiano, supra,* a nation wide litigation expert was awarded the same rate as Ms. Labinger.

To begin with, this Court does not accept that Ms. Labinger was quite the neophyte as pictured by the defendants. At page two of their memorandum they state:

However, defendants note that at the time of trial of this action, Ms. Labinger had been engaged in the practice of law for less than one year. During that period, Ms. Labinger tried one case and participated in pre-trial activity in three other cases.

A supplemental affidavit filed by Ms. Labinger and not refuted by the defendant establishes that "prior to institution of the written matter in April, 1977, [she] appeared as counsel of record and/or participated along with other members of [her] firm in the following civil rights cases in the United States District Court, District of Rhode Island: *Pelletier v. Connors* (equal protection, due process); *Haste v. Rhode Island School of Design* (age discrimination); *Chang v. University of Rhode Island* (sex discrimination); *Ballard v. Kenneth* (police brutality). This list is not exhaustive, and does not include, *inter alia,* legal

---

**4.** I believe the defendant meant to cite this Court's unpublished opinion, *Lamphere v.*

*Brown,* C.A. 75–0140, (D.R.I. Feb. 22, 1979); 610 F.2d 46 (1st Cir. 1979).

services performed by [her] before Rhode Island Human Rights Commission and/or Equal Employment Opportunity Commission in employment discrimination proceedings." Furthermore, as the plaintiff points out, service by an attorney as law clerk to a Court of the United States was included by the State Supreme Court in determining total time engaged in the actual practice of law. In re: *Petition of Hans Peter Olsen*, 112 R.I. 673, 675, 314 A.2d 140 (1974).

In *Lamphere*, as stated in this Court's opinion awarding the fee, lead counsel was awarded $60 per hour in 1974, and $70 per hour in 1975, and $70 per hour in 1975 through 1979 for out of court services (in court work involved motions argued in 1974; the matter was settled by a consent decree in 1977). I concluded then that the "nature of this case [*i.e.* the case at bar] warrants a similar fee [*i.e.* similar to *Lamphere*] of $75 per hour for trial work and $70 per hour for legal out of court work." *Lamphere* and *Palmigiano* cases were very much in the Court's mind in determining what award should be made here. I cannot draw any meaningful distinction between the work now at issue and *Lamphere* or *Palmigiano*. In my original opinion I pointed out in this original fee award the skill required in grasping the specialized nature of the controversy, the sensitivity and controversial nature of the contest, the unusual preparation required because almost every witness who testified was a trained professional, the trial skill needed to develop the bias and self-serving interest of witnesses; I said such interest could only be revealed "through extensive and penetrating cross examination." At page 4 of the slip opinion, *supra*, I stated

> In order to show the protected nature of the plaintiff's speech, it was necessary to develop and present evidence exposing the chaos which resulted at the Northern Rhode Island Unit of the Institute of Mental Health from a restructuring phase which was implemented abruptly and without complete preparation. The case delved into the disruption of patients and the use of medications to subdue them, shortage of furniture, lack of necessities, misplaced and outdated medical records, increase of overtime pay, lack of patient care, and deterioration of staff morale. A mediocre performance would have failed, in the management of pre-trial discovery and in the courtroom, to develop these conditions with clarity—and thus would have failed to portray the ambience which vindicated the plaintiff's critical speech. This task demanded the skill of an accomplished advocate.

When I add to this the time pressures, as described in the original opinion, slip op. at page 5, *supra*, and the complexities and novelty of the issue which the appellate court recognized, I cannot logically find that in *Lamphere* and *Palmigiano, supra*, there were those elements that set them above this case for evaluation of a reasonable fee.

Even handed payment of fees is, of course, important but, like sentencing, there are no two cases alike; there is no applicable mathematical formula. The good conscience of the court applied to a case, as it sees the controversy in its entirety, and which is not always subject to precise articulation, is an indispensable ingredient. A fee award in one case cannot be the all important litmus to test the merit of an award in another case. The defendant's reliance on *Palmigiano* and *Lamphere, supra*, is, in my opinion, an unimpressive analogy; stripped of the years before the bar and reputation of counsel, there is no sufficient difference as to warrant disparate treatment. On a value basis, I cannot justify reducing the hourly rate originally awarded. However, the inquiry does not stop here: the next point is whether the fee award creates the impression of favoritism. To me this most difficult issue, which was not raised at trial, is dependent on the end result of the analysis which the First Circuit requires me to make. If I conclude that reasonable time was spent on the post trial memorandum, the work done compiling the proposed findings of fact was not suitable for para-legals, there was no duplication of work and the hourly rate was reasonable, then there can be no cry of

favoritism. I do not believe the First Circuit is saying that even if these tests are passed, nevertheless, the judicial process embodies arbitrary decision making devoid of fairness, and justice; and need not be squared with the good conscience of the court. On this premise I cannot reduce the hourly rate awarded—indeed, as will follow, I cannot reduce the awards originally made. If there are those who will criticize, then, in my opinion, their utterances will have no sound factual basis.

I am sure the reader appreciates that the "favoritism inquiry" is a sensitive one to the writer. Subjectively such a sacrilege was not committed—at best it can only be a question of appearance. I add to why I find it hard to see even this:

1) No "extra ordinary" rate is involved. Previous rulings from this district have established that customary rates range from $60 to $100 an hour—$70/hour for out of court and $75/hour for in court services, certainly, are well within this range.

2) Co-counsel Roney contributed equally and brought the same skill and ability to all phases of the case: defendants concede the propriety of awarding Roney the $70/$75 rates sought. How can one possibly conclude, therefore, that Labinger is entitled to less? It simply cannot be; the only difference between these attorneys being the fewer years Labinger has practiced and that I find meaningless as already explained.

*Time spent on the post trial memorandum; Suitability of work for para-legals*

At the post remand hearing no meaningful challenge was made by the defendant's counsel. Indeed, it was rather discouraging—this is not to say anything could have been done—fertility of a person's cerebrations is an unknown quantity until revealed—perhaps some other defense counsel may have been able to penetrate this area and thus expose duplication of effort and unreasonableness of expended time. Without becoming a total advocate the Court made its own inquiry and fared no better;

it merely cemented the plaintiff's original claim. Not only did cross examination remain fallow, but neither did the defendants present any evidence attacking the validity of my original findings.

Attorney George Vetter, who is a litigation specialist of some twenty years and who authored a book entitled Successful Civil Litigation, and who is presently serving as chairman of the Board of Federal Examiners for this District, testified as follows after reviewing this case and concluding it presented "an exceedingly complex fact situation":

"[I]n order to do the proper job for your client, in order to adequately represent your client, in order to present the case to the Court in the best way, and so that to be able to help the Court[,] you need on complex matters to have somebody that you're working with, talking things over with, dividing up the labor with, obviously, that's something which is just obvious in this field, and that without it the presentation is simply, probably is not going to be nearly as good as otherwise would be." (Tr. 3–30)

He also stated it is virtually universally accepted that in complex cases, attorneys work together editing each other's drafts, conferring with each other in the process; clients are billed for time of both lawyers.

On my inquiry he also testified as follows:

"Knowing my own practice and how I do things, I'm sure that in cases that were as complex as this I put at least that much, if not more time into my post-trial materials, and I will unqualifiedly say that in a bench trial if the proposed findings of fact and conclusions of law and supporting memorandum are not absolutely top drawer, the person is not doing their job as an advocate, and that's especially so in instances where, in which there might not be an opportunity for oral argument. That's the vehicle that the advocate has, to persuade the Court, and that goes for both sides of the case." (Tr. 3–52).

This comports with my original comment at page 6 of the first award opinion:—

"plaintiff rightly concluded that detailed proposed findings of fact and conclusions of law were necessary, obviously realizing that the art of advocacy in non-jury cases may be critically waged in such documents. In this case, the need to break down the testimony of the many witnesses, develop the conditions at the institution, and argue the somewhat novel legal issue at stake justified the time recorded for the preparation of the post-trial brief. It was of infinite help to the Court. It is indeed unfortunate that many attorneys fail to attach enormous importance to this facet of non-jury trial work." Opin. at 11–12.

If the Court may be permitted to go outside the record it is a known fact that in a bench trial it demands full and complete post-trial memoranda; it will not countenance anything less. Certainly my findings of fact were far less extensive than the plaintiff's memorandum. This is not at all unusual in cases tried to a judge. The plaintiff is correct in arguing that a court's opinion need not discuss all issues once a dispositive point is reached; here, I did not have to reach plaintiff's state law claims since my ruling on the First Amendment was dispositive; I was not required to recite the detail as to why a witness should or should not be believed. I cannot fault counsel for thoroughness, to me the time expended and the length of the brief were reasonable and necessary. Alas! attorneys, all too often, fail to attach the utmost importance to this aspect of their case.

The defense, in its brief argues in conclusory terms: "Even in view of Ms. Labinger's additional responsibility it is difficult to correlate counsels' testimony that the workload was divided as equally as possible and the disparate time spent by counsel on substantially equal tasks." I cannot interpret any evidence in the record which substantiates this statement. Defense had plaintiff's time sheets—there was no meaningful attack on these.

Based on Mr. Vetter's testimony, lack of evidence by the defendants to the contrary, defendant's failure to advance any testimony that the work could have been done by para-legals or "exceeded the bounds of reasonable effort," and my own evaluation of the case as I saw it, I again conclude that the time spent on the post-trial memorandum was reasonable and that para-legals were not suitable for any of the tasks.

*Duplication of work—particularly at trial*

As to the trial itself the defendants stipulated that the presence of two attorneys at trial was not duplicative.

As to the other work in the case I find no evidence that it can be termed duplicative; the testimony is to the contrary. Mr. George Vetter, *supra.*

As a guide for other cases I state there was no duplication here because the two attorneys did not *un*necessarily perform the same task. This really isn't any different than opinion writing where there is duplication with law clerks—that is necessary duplication so as to have the final product precisely reflect the Court's mind.

"Even at the opinion-writing stage, collaborating with a law clerk takes many forms. The clerk's participation ranges from a minimum of checking citations and minor editing, to being responsible for parts of an opinion ... to crafting short opinions, and to maximum participation, having initial responsibility for a complex and significant opinion.

.     .     .     .     .

When my clerk and I—or sometimes in major cases all three clerks and I work in tandem, each taking a distinct part of an opinion ...

The Ways of a Judge, by Chief Judge Frank Coffin, at 155–156, 163.

The Chief Judge goes on and explains the editing, drafting and redrafting shared by him and his clerks.

I must reiterate my original position that there was no unnecessary duplication of work in this case.

After this consideration of all four factors, I stand fast in the validity of the original findings in all its aspects as to both Ms. Labinger and Mr. Roney. Roney's

award was not actually questioned. Because the original judgment was vacated, I again order the same amount be paid including the costs and disbursements, to which there is no objection.

In addition, the plaintiff now seeks additional costs and an upward adjustment to reflect delay in payment recognized as appropriate in *Furtado v. Bishop*, 635 F.2d 915 (1st Cir. 1980).

I find this particularly troublesome; a denial of an increment deprives the plaintiff's attorneys of money they could have made had this judgment been promptly paid; on the other hand to grant such an increment penalizes the defendants for a delay beyond their control. Certainly they had the right to appeal the original judgment. If the First Circuit had sustained the appeal this issue of an additional award for District Court work would not be before me. The remand was on *sua sponte* issues raised by the appellate court stemming from a "rather rare situation" which if nonexistent, it would ordinarily have had "no difficulty in affirming". If affirmed the plaintiffs could have sought an award for their appellate work as vindication for the extra time and effort imposed upon them by the defendant's meritless appeal. I do not believe the defendants can be faulted for the remand and the further delay it has caused; likewise, I do not feel it can be said their appeal was not successful albeit not based on issues they raised. This is a "rare" situation for which the defendants should not be penalized with an assessment of additional fees and costs. Furthermore, I interpret the First Circuit's mandate to be limited to a review by me of the areas they delineated and to adjust the fee downward, if justified after applying the "rigorous standard of scrutiny [it] set forth". The strictures of this interpretation foreclose any accretion of the October 30, 1979 award.

Now it may be that legitimate argument can be made to the contrary. Therefore, I reserve to the plaintiffs the right to re-argue this issue if they so desire provided briefs are received within two weeks from the date of this opinion; otherwise it is ordered that the award as first made plus all costs as then assessed stands.

An order will be prepared accordingly.