Ronald BRULE, et al.

v.

Bradford SOUTHWORTH, et al.

Civ. A. No. 77–554P.

United States District Court,
D. Rhode Island.

Nov. 3, 1982.

See also 1 Cir., 611 F.2d 406.

Lynette Labinger, Providence, R.I., for plaintiffs.

Stephen M. Robinson, R.I. Dept. of Corrections, Cranston, R.I., for defendants.

## OPINION

PETTINE, Senior District Judge.

In this 42 U.S.C. § 1983 case, which was successfully tried to the Court and affirmed on appeal, the plaintiffs' attorney seeks an award of fees pursuant to 42 U.S.C. § 1988. The Court found that the defendants violated the plaintiffs' rights protected by the First and Fourteenth Amendments to the United States Constitution. The procedural history, giving rise to this action, and a prior action from which it stems, is set forth in *Brule v. Southworth,* 611 F.2d 406 (1st Cir.1979); it need not be repeated here.

As a result of stipulations made and evidence adduced at a hearing held on April 23, 1982, certain issues were settled and need not be discussed by the Court. These are as follows:

a) The plaintiffs are prevailing parties and are entitled to fees under 42 U.S.C. Sec. 1988.

b) Accuracy of the time records submitted by plaintiffs' counsel. (Pl.Ex. 2 ¶ 6).

c) Competence or ability of Lynette Labinger, counsel for the plaintiffs, in the performance of her services in this matter. (Pl.Ex. 2 ¶ 7).

d) The hourly rate of $75 per hour is appropriate to be applied as to all hours (both in and out-of-court) which are either uncontested or awarded by the Court for services rendered on January 1, 1979 and thereafter. (Pl.Ex. 2 ¶ 8).

e) None of the services for which fees are sought should have been performed by a paralegal or should be compensated at rates for paralegal or other nonlawyer rates.

f) No issue remains as to travel time or time spent in grievance proceedings. (Pl.Ex. 3 ¶ 3, 4).

g) An award of costs may be made in the amount of $2,542.33

h) With respect to legal services rendered between November 1977 and December 31, 1978, the rates of $50/hour out-of-court and $55/hour in-court are appropriate for all uncontested hours and those awarded by the Court. (In their briefs the plaintiffs clearly set forth that they do not agree that this is or should be an appropriate rate; however, the defendants' concession establishes a floor for the rate determination.)

The defendants do contest the following claims by plaintiffs' counsel:

1. The hourly rate being sought for the period between November 15, 1977 and December 31, 1978.

2. The reasonableness of 55 hours spent between December 6, 1977 and December 26, 1977 in trial preparation.

3. The reasonableness of 128 hours preparing a post-trial brief.

4. The reasonableness of 112 hours preparing appellate briefs.

5. The plaintiffs' 10% bonus claim, and

6. The plaintiffs' contention that the "lodestar" should be increased to reflect "delay in payment".

In addition the defendants argue, as to the fee being sought for the prosecution of this application for attorneys' fees, that plaintiffs' counsel, Ms. Labinger and her retained associate Mr. Roney, should not have their respective hours added in the computation because they engaged in unnecessary duplication of work.

The defendants' concession that plaintiffs are entitled to fees is premised on the firmly established principle of entitlement under 42 U.S.C. § 1988, absent special circumstances which render such an award unjust. *Nadeau v. Helgemoe,* 581 F.2d 275, 279 (1st Cir.1978); *David v. Travisono,* 621 F.2d 464 (1st Cir.1980). The award may also include costs, and additional fees for work performed on appeal. *Souza v. Southworth,* 564 F.2d 609 (1st Cir.1977). The fees may be taxed against the Department of Corrections as well as the named defendants. *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). "[T]he ultimate determination of the amount of the fee to be awarded requires a close filtering factual analysis of the case through the standards enunciated in *King v. Greenblatt,* 560 F.2d 1024 (1st Cir.1977), and the teachings of *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974)." *Palmigiano v. Garrahy,* 466 F.Supp. 732 (D.R.I.1979).

In *King v. Greenblatt, supra,* the criteria considered for an award under 42 U.S.C. § 1988 are:

1) the time and labor required; 2) the novelty and difficulty of the question presented; 3) the skill required to perform the legal services; 4) the preclusion of other employment by the attorney due to acceptance of the case; 5) the customary fee in the community; 6) whether the fee is fixed or contingent; 7) time limitations imposed by client or circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation and ability of the attorney; 10) the undesirability of the case; 11) the nature and length of the professional relationship with the client; 12) awards in similar cases. *Id.* at 1026–1027 describing *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–719. (5th Cir.1974).

The analysis of these criteria is a tough and at times a frustrating task. The distinctions are unrefined and not subject to precise categorization and thus, individualized considerations. The First Circuit recognized this difficulty in *Furtado v. Bishop,* 635 F.2d 915 (1st Cir.1980) wherein it stated that "[t]his approach recognizes that commenting on the twelve factors identified in *Johnson v. Georgia Highway Express, Inc.* [488 F.2d 714 (5th Cir.1974) setting out the factors adopted in *Greenblatt, supra* ] may not in any real sense contribute to the rational setting of a fee; the comments are imprecise and the items overlap." 635 F.2d at 920.

The First Circuit then set forth the following formula:

In an effort to develop a useful analytical framework that can be applied by trial courts in all cases and can also lend itself to meaningful review, the Third and D.C. Circuits recognize two levels or steps in analysis. The starting point is to calculate the "lodestar": "The number of hours reasonably expended multiplied by a reasonable hourly rate." *Copeland* [*v. Marshall,* 641 F.2d 880], at [891]. This would involve separating out work done in relation to a firm's hierarchy, from senior partner to junior associate (and, we would add, including work that was or ought to have been assigned to a nonlawyer); eliminating time beyond that consistent with a standard of reasonable efficiency and productivity; and, after receiving documentation and possibly holding a hearing, assigning appropriate hourly rates for the kinds of work done by those at different levels of expertise. This results in a "lodestar" fee that then is adjusted upward or downward to reflect the contingent nature of any fee (if such is not reflected in the hourly rate), delay in payment, quality of representation (i.e., an unusually good or poor performance above or below the skill already reflected in the hourly rates), exceptional (and unexpected) results obtained, etc. For a more detailed discussion, *see Copeland,* at [889–94].

*Furtado v. Bishop, supra,* at 920.

However, *Furtado* does not overrule *Greenblatt. Miles v. Sampson,* 675 F.2d 5, 8 (1st Cir.1982). The district courts are still required to express their views on the factors identified in *Greenblatt. Sampson, su-*

*pra,* at 8. This is quite understandable because only through an analysis of such factors can a court fathom all the components of the "lodestar"; the ultimate design of which is to 1) "attract competent counsel" who will exhibit "the same standards which prevail in other types of equally complex Federal litigation such as antitrust cases"; and 2) achieve the ultimate goal of a fair and reasonable fee under all the circumstances.[1] Within the discipline of the foregoing, I will attempt arriving at a proper fee.

### A. The Greenblatt Factors

The defendants do not contest the need to apply these factors. They do, however, dispute how each factor should be applied to the specific claims at issue. Each will be considered in turn.

### 1) Time, labor and skill

The basic case from which this dispute arises was, in a sense, a spinoff from a hotly contested and notorious inmate class action suit commenced on November 29, 1977. The class action concerned an extended indefinite "lockup" of the entire maximum security section of the Rhode Island Adult Correctional Institution; tangentially that litigation involved, among other things, the conduct of the plaintiffs in the performance of their jobs, which the defendants alleged was the cause for their suspension from their assignments as prison officers and guards. On the other hand, the plaintiffs claimed that the defendants were guilty of violating their First Amendment, Due Process and Equal Protection rights. The development of the plaintiffs' case, to prove the falsity of the charges against them, required a thorough investigation of all the historical facts surrounding the disturbance at the prison. This had to be done in an ambience of prison hostility and distrust. No one questions the difficulty of this task; it involved the sifting of complex facts and the probing of charges and counter charges which hinged on the credibility of witnesses. It is uncontrovertible that careful preparation and skill was crucial to the success of the plaintiffs' case. The acquisition of this proficiency required total effort squeezed into a short pre-trial preparation period. The "time and labor required", the "skill required to perform the legal services", "time limitations imposed by client or circumstances", and the "preclusion of other employment" are manifest; indeed, in their post-trial brief, the defendants do not contest these factors.

### 2) Experience and reputation of plaintiffs' counsel

The experience, reputation and ability of Ms. Labinger was conceded. The defendants stated that they have nothing but the "highest regard for [her] professional integrity and competence and none of the issues raised by [them] are intended to question [this factor]." Defendants' memorandum at p. 2.

### 3) The amount involved and the results obtained

The plaintiffs achieved full success before this Court and on appeal; their jobs were secured and important First Amendment rights were vindicated. The plaintiffs rightly point out the importance of First Amendment claims in class action prison suits.

> [T]he public certainly has an interest in knowing the full extent of the operation of one of its most sensitive institutions—the prison. It has a right to know how its monies are being spent in the incarceration of people because the manner of confinement affects not only the treatment of the individual inmates, but the security of the State itself. Free and open speech by those possessing unique knowledge of the inner workings of such places is particularly important as it relates to the penal policies of the State and the conduct of those charged with its administration. The intimate daily work-

---

1. *See,* S.Rep. No. 1011, 94th Cong.2d Sess. reprinted in [1976] U.S.Code Cong. & Adm.News 5908, 5913; H.Rep. No. 1558, 94th Cong.3d Sess. 9 [1976]. *Accord King v. Greenblatt, supra* at 1026; *Lund v. Affleck,* 587 F.2d 75, 77 (1st Cir.1978).

ings of a prison are, by their very nature, shielded by prison walls. The exercise of First Amendment interests, ferreting out the truth, through public debate, is the potent weapon that can penetrate the enclosure and expose prison life to public scrutiny.

Plaintiffs' Memorandum filed April 30, citing *Jefferson v. Southworth,* 447 F.Supp. 179 (D.R.I.1978).

### 4) *Fixed or contingent fee*

The case was taken essentially on a contingent basis notwithstanding plaintiffs' attorneys received an $8500 retainer. As the Court understands it there is an arrangement whereby the plaintiffs will be reimbursed their initial retainer or at least a portion thereof. At any rate counsel's affidavit and memoranda stand uncontradicted and sufficiently establish it was understood that the retainer fell far short of the amount that would adequately pay for the legal services rendered and to be performed in the future. Besides the retainer, which was the plaintiffs' sole liability, the case was taken on the basis of a possible award under 42 U.S.C. § 1988.

### 5) *Undesirability of the case and the nature and length of the professional relationship with the client*

There was nothing particularly undesirable about this litigation; no special claim is made in this regard. Counsel had not represented the plaintiffs before and in all probability the relationship offers no likely prospect for future business.

### 6) *Customary fee in the community*

Ms. Labinger is seeking $75 an hour for in-court time and $70 an hour for out-of-court time. These hourly rates comport with those approved in *Pilkington v. Bevilacqua,* 522 F.Supp. 906 (D.R.I.1981), *Lamphere v. Brown,* C.A. No. 75–140 (D.R.I. Feb. 22, 1979), *aff'd.,* 610 F.2d 46 (1st Cir. 1979). *Palmigiano v. Garrahy,* 466 F.Supp. 732 (D.R.I.1979), *aff'd.,* 616 F.2d 598 (1st Cir.1980). In keeping with the same rationale articulated in those cases I find that the

rate requested here was the customary fee charged at that time in this community for cases of this kind. This case was no less complex than these others and the success achieved was no less complete. The parties stipulated that all evidence relevant to the issue of "customary fees charged in the community for the years 1977 to the present" (Pl.Ex. 1) as introduced in *Palmigiano* and *Lamphere* could be deemed part of this record. It should be noted further that Milton Stanzler, the senior partner in the firm of Attorney Labinger stated that Ms. Labinger's experience and qualifications caused the firm to establish a billing rate of $75 an hour as to her services from the time she joined the firm in September 1976.

The factors discussed, *supra,* have not been placed in issue. However, the Court feels it had to express its views because all these factors play a part in determining the reasonableness of the expended hours, hourly rate and ultimate adjustment of the "lodestar". After this is done all that is left is the resolution of the contested issues set forth, *supra.*

1. *The defendants' contention that the use of rates of $70/hour for out-of-court work and $75/hour for in-court work between November 1977 and December 31, 1978 should not be paid.*

It is not argued that the hourly rate is excessive but rather that in this case it should not be paid to Ms. Labinger. In support, the defendants present a two pronged argument:

a) The "lodestar" theory enunciated in *Furtado, supra,* requires the Court "to separate out who performed the work and make some consideration based on levels of experience and expertise", *i.e.* a "senior partner's work might be worth more per hour than a junior associate." Defendants' Memorandum received Aug. 10, 1982 at p. 5. And since the senior partner in Ms. Labinger's firm was paid by this Court in *Lamphere v. Brown University,* 610 F.2d 46 (1st Cir.1979) at the rate being requested by Ms. Labinger in this case for work he did in

that complicated sex discrimination case, she should receive something less.

b) A downward adjustment should be made to avoid, "possible public criticism when, in the words of the First Circuit, the Plaintiffs' attorney is a recent former law clerk." *Id.* In referring to the First Circuit the defendants are citing *Pilkington v. Bevilacqua,* 632 F.2d 922, 925 (1st Cir.1980).

I reject the defendants' arguments. Similar contentions were made in *Pilkington v. Bevilacqua,* 522 F.Supp. 906 (D.R.I.1981) and there I found they lacked merit. I adopt here the same reasoning as in *Pilkington, supra.*

In *Furtado, supra,* the First Circuit does suggest that a fee calculation involves "separating out work done in relation to a firm's hierarchy, from senior partner to junior associate." I find this consideration to be inapplicable here. Attorney Labinger rightly points out that she was sole counsel at trial; "[a]s such, any characterization of Labinger as 'associate' or 'junior counsel' herein would be misplaced." Furthermore, the senior partner of the firm to whom the defendants refer, testified that as managing partner he established Ms. Labinger's billing rate as of September 1976, when she joined the firm, at $75 per hour. He further testified that by May of 1977 he considered her trial competence equivalent to 50% or more of the members of the bar. The trial experience of Ms. Labinger in Civil Rights cases have all been set forth in *Pilkington, supra.*

Next, the state again raises the "favoritism inquiry" though it did not see fit to appeal my rejection of this imputation in *Pilkington, supra,* where it was originally raised. It is now six years since the termination of Ms. Labinger's clerkship; it seems to me the time has come for the state to realize that this approach simply does not impress the Court. Reluctantly I engage in a supererogatory exercise, by reiterating as applicable here, the position I took in *Pilkington, supra.*

Even handed payment of fees is, of course, important but, like sentencing, there are no two cases alike; there is no applicable mathematical formula. The good conscience of the court applied to a case, as it sees the controversy in its entirety, and which is not always subject to precise articulation, is an indispensable ingredient. A fee award in one case cannot be the all important litmus to test the merit of an award in another case. The defendants' reliance on ... *Lamphere, supra,* is in my opinion, an unimpressive analogy; stripped of the years before the bar and reputation of counsel there is no sufficient difference to warrant disparate treatment. On a value basis, I cannot justify reducing the hourly rate.... However, the inquiry, does not stop here; the next point is whether the fee award creates the impression of favoritism. To me this most difficult issue ... is dependent on the end result of the analysis which the First Circuit requires me to make. [If I do this objectively and, in my opinion fairly] then there can be no cry of favoritism. I do not believe the First Circuit is saying that even if these tests are passed, nevertheless, the judicial process embodies arbitrary decision-making devoid of fairness, and justice; and need not be squared with the good conscience of the court. On this premise I cannot reduce the hourly rate [that I compute should be awarded]. If there are those who will criticize, then, in my opinion, their utterances will have no sound factual basis.

I am sure the reader appreciates that the "favoritism inquiry" is a sensitive one to the writer. Subjectively such a sacrilege [is not being committed]—at best it can only be a question of appearance. I add to why I find it hard to see even this:

1) No "extraordinary" rate is involved. Previous rulings from this district court have established that customary rates range from $50 to $100 an hour— $70/hour for out-of-court and $75/hour for in-court services, certainly are well within this range.

*Id.* 910, 911.

2. *Defendants' contention that the 55 hours spent by plaintiffs' counsel between December 6, 1977 and December 26, 1977 in trial preparation is excessive.*

"[T]he defendants do not contest the fact that Plaintiffs' attorneys actually spent those contested hours on the case"; they simply feel that the time is excessive. They merely offer, to justify their position, that "the average attorney bills between 1500–1800 per year. By that standard, the plaintiffs have spent nearly seven (7) weeks in preparation of post-trial and appellate briefs. This time was spent following briefings by Attorney Labinger in *Pilkington v. Bevilacqua* case which, although different, had many aspects which were identical to the present case." Defendants' Memorandum at p. 4.

Defendants both at trial and argument did not refute the specific contentions of the plaintiffs. These were as follows:

a) Defendants' concession that the time spent in preparation of depositions was reasonable and necessary (Pl.Ex. 3 ¶ 5a).

b) The trial was continued at the defendants' request; documents were submitted by defendants for the first time one week before the new trial date. This required further work by the plaintiffs to prepare further examination and refinement of contemplated cross examination.

c) The need for thorough assimilation of the depositions of the two defendants Southworth and Laurie who were to be called as adverse witnesses.

d) The testimony of George Vetter, one of Rhode Island's leading trial lawyers, that there was need for the time and effort expended by Ms. Labinger in order to have "finger tip" control.

e) The "absolute" necessity to review various documents comprising between 700 to 1000 pages.

f) The need for client conferences to educate her as to the prison setting and the facts underlying the case, particularly since she had no connection with the case before

November 19, 1977, that is, exactly one month before the original December 19, 1977 trial date. This, as the other contentions, was corroborated through independent evidence.

g) Finally, the further testimony of Mr. Vetter who, after studying the case and the filed documents, stated that the 55 hours at issue spent by Labinger in pre-trial preparation was "pre-eminently reasonable," appropriate and not excessive.

All of this stands uncontradicted; the defendants offered no testimony of any kind to the contrary. Likewise as to the defendants' claims that the 128 hours spent in preparation of the post-trial brief was unreasonable and that the 112 hours spent on the appellate brief was excessive, no evidence whatsoever was presented analyzing the time to show just what was unreasonable and unnecessary. The record will show that the Court attempted to "prod" counsel but certainly it did not attempt to try the defendants' case.

As the district courts have a duty to identify the specific hours it disallows with its reasons for doing so, *Fitzpatrick v. I.R.S.*, 665 F.2d 327 (11th Cir.1982); *Matter of First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977); *Morrow v. Finch*, 642 F.2d 823, 824 (5th Cir.1981), *Northcross v. Board of Education*, 611 F.2d 624, 636–637 (6th Cir.1979), so too a defendant has a commensurate responsibility to either pay the fee being sought or to oppose the fee in a meaningful adversarial way. This responsibility was not met by the defendants. If a case must be decided on the record, built on exhibits and testimony, there is little doubt what must be done in this case.

3. *Defendants' contention that the 128 hours and 4 minutes in preparation of the post-trial brief was unreasonable.*

There is a rather marked similarity in the way the *Pilkington, supra,* fee case and this

litigation were defended by the state attorneys. What I stated in *Pilkington,* relative to the time spent on the post-trial memorandum, is applicable here and fits so well that I adopt it, and reiterate the pertinent portions as my findings and conclusions in this controversy:

> At the . . . hearing no meaningful challenge was made by the [defendants'] counsel. Indeed, it was rather discouraging—this is not to say anything could have been done—fertility of a person's cerebrations is an unknown quantity until revealed—perhaps some other defense counsel may have been able to penetrate this area and thus expose duplication of effort and unreasonableness of expended time. Without becoming a total advocate the Court . . . [made some attempt at probing:] cross examination remain[ed] fallow . . . .
>
> *Pilkington,* 522 F.Supp. at 911.

Ms. Labinger testified she organized her proposed findings of fact and conclusions of law to support the different legal theories she was asserting. In addition she addressed the question of damages. The defendants' claim that this was a road she had traveled in *Pilkington* does not impress me. Though *Pilkington* may have been a foundation piece, I find plaintiffs' counsel is correct in saying she had to update the law and prepare arguments and do legal research on claims not presented in *Pilkington, i.e.* sec. 1985(2), equal protection, due process and damages.

Again applying *Pilkington* to this case Mr. Vetter testified that, ". . . knowing [his] own practice and how [he does] things [he is] sure that in cases that were as complex as this [he] put at least that much, if not more time into [his] post trial materials, and [he would] unqualifiedly say that in a bench trial if the proposed findings of fact and conclusions of law and supporting memorandum are not absolutely top drawer, the person is not doing their job as an advocate, and that's especially so in instances where, in which there might not be an opportunity for oral argument. That's the vehicle that the advocate has, to persuade the Court, and that goes for both sides of the case."

In *Pilkington* I stated and repeat here that such an approach, "comports with [my strong feelings] that detailed proposed findings of fact and conclusions of law [are] necessary . . . the art of advocacy in non-jury cases . . . . [is] critically waged in such documents. In this case the need to break down the testimony of the many witnesses, develop the conditions at the institution, and argue . . . . [the] legal issue[s] at stake justified the time recorded for the preparation of the post-trial brief. It was of infinite help to the Court. It is indeed unfortunate that many attorneys fail to attach enormous importance to this facet of non-jury work." *Id.* 911, 912.

I cannot fault the plaintiff for a complete and thorough job. I find the hours spent were reasonable and necessary.

4. *Defendants' contention that the 112 hours spent by Labinger between September 17 and November 2, 1979 in preparation of the appellate brief in this matter were unreasonable and/or excessive.*

On appeal the defendants argued for the first time that there was no "case or controversy" before the trial Court and, therefore, it lacked jurisdiction to hear the matter; they contended the action was not "ripe" for adjudication because the plaintiffs had not suffered nor were threatened with any injury; that the pre-hearing suspension with pay, allegedly taken in retaliation for exercising First Amendment rights is not cognizable under 42 U.S.C. § 1983. In other words without a denial of salary there is no 42 U.S.C. § 1983 violation even though the employment action was taken to deter exercise of the First Amendment.

The plaintiff had to respond not only to the jurisdictional argument but as well to the underlying contention that the plain-

tiffs failed to state a First Amendment claim.

I feel somewhat restricted in evaluating the need for the 112 hours claimed, since I did not have to study their briefs as required by my appellate brethren. However, from my perspective I do not find the time expended excessive. Since the issues were presented for the first time on appeal they necessarily required legal research and writing above and beyond what had been done for the district court. This fact coupled with independent testimony that such extra work was absolutely necessary, and the defendants' failure to present any evidence that this time spent on the appellate brief was unreasonable causes me to accept all of the 112 hours as compensable time.

5. *Unnecessary duplication in rendering legal services on the application for attorneys' fees.*

The plaintiffs' attorney states that she engaged Attorney John Roney to participate in the fee aspect of this case because the inevitable evidentiary hearing would require full exploration of all areas of concern expressed in *Pilkington, supra.* In her opinion this required assistance of additional counsel.

I cannot say that this conclusion was unreasonable. *Pilkington,* did touch an element of the subjective—the recent relationship of a former law clerk. It follows that the fee award hearing had to be presented in a most objective manner through independent witnesses and an attorney other than the one seeking the fee. Testimony from Ms. Labinger was certainly required; I don't see how this could be effectively accomplished as a solo performance, any more than I can see how the subjective position of Ms. Labinger could best be championed without a protagonist.

The plaintiffs presented not only Ms. Labinger's testimony but also other evidence that Mr. Roney's participation was required and that the division of labor as described by the plaintiffs was reasonable and conformed to practices generally adopted and followed by attorneys.

Here again, as in *Pilkington,* the defendants presented no evidence; they identified no duplicative hours. In short, they simply objected without giving the Court any assistance.

Based on the evidence and my personal evaluation, I believe and so find that Mr. Roney's participation was necessary and that the time spent is reasonable. I have no alternative but to so find—unless I arbitrarily and without any developed factual premise summarily cut out a number of the hours claimed.

6. *The 10% contingency bonus.*

The defendants do not oppose this as such. They have not directly argued against such award nor have they briefed the issue. They contend that the plaintiffs have attempted to introduce issues as to bonus, lodestar multipliers, current economic value and interest rates to be added to the basic lodestar fees the Court chooses to award, (these will be discussed *infra*) contra to the stipulation entered in the case on February 12, 1982. The defendants contend that par. 5, (a) through (e) of the stipulation, *see* Pl.Ex. 3, precludes the plaintiffs from introducing such additional issues. Paragraph 5 of the stipulation reads:

> 5. As a result of the within stipulation, and the stipulations entered on September 10, 1980 and January 12, 1982 the contested issues in this case are limited to the following:

The issues then set forth are those listed as items 1, 2, 3, 4 at page 1158, *supra* and the argument that plaintiffs' counsel engaged in unnecessary duplication.

Before addressing this question I point out that "incentive awards" have been discussed by this Court in *Pilkington, supra,* and *Lamphere v. Brown University,* C.A. No. 75–140 (D.R.I. Feb. 22, 1979), *aff'd.,* 610 F.2d 46 (1st Cir.1979). Without reiterating

said analysis, such an award is contingent on the probability of succeeding in the basic case. Since I find that the stipulation does *not* dictate to the contrary, a bonus award of 10% is fully justified and is hereby awarded. There was no assurance of success since the case rested heavily on the credibility of witnesses and development of a complicated fact pattern.

### 7. *The stipulation as waivers*

The defendants argue that the stipulation should be given its "plain and popular" meaning and that the Court "should not look behind the document" because "it is clear on its face" since it states the issues are limited to "those five areas", and that this is so despite the plaintiff pointing to an earlier paragraph referring to contemplated testimony of Dr. Rohr. The defendant is referring to the last half of a paragraph in plaintiff's exhibit 2, a prior stipulation. The paragraph reads, "That the testimony of Robert Rohr, in the case of *Pilkington v. Bevilacqua, supra,* as to his qualifications and methodology may be admitted into evidence in this proceeding and a transcript of those portions of Professor Rohr's testimony, approved by the parties, shall be submitted as an exhibit in this matter, Provided However, that in agreeing to the submission of this testimony, the defendants shall not be considered to have approved or accepted said testimony or to have waived any right they might have to argue as to its weight."

The defendant urges that the last half of the paragraph makes it clear that the state is not waiving anything.

More persuasively the plaintiffs argue that the last half of the paragraph was agreed to because it is a material issue in the case and that the defendants so admitted when they agreed to include that paragraph in the stipulation. In other words the plaintiffs say that even though specific areas were set out in exhibit 3 it does not preclude paragraph 2 of exhibit 2 which shows it was always intended that testimony would be presented to justify some sort of a bonus award, and that the government was well aware of it, indeed, agreed it be part of the stipulation. The plaintiffs further point out that when Dr. Rohr's testimony was offered in open court there was no objection by the defendants; finally when exhibit 19, Dr. Rohr's testimony, was entered it was done by stipulation without any objection by the defendants.

It seems clear to this Court that a waiver was never intended and I so rule.

### 8. *Computation of the award*

None of the hours being in dispute and no para-legal work involved, I find that "the number of hours reasonably expended" are as proven by the plaintiffs and as set forth

in plaintiffs' exhibit 17 as amended.[2] In a hearing held on September 17, 1982 counsel for the defendants categorically reiterated the assertion he had made in his post-trial brief; he stated, "[T]he state has never contended that any of the calculations made by Mr. Roney and Ms. Labinger have been incorrect." He further affirmed that if the Court accepts that the plaintiffs should be paid seventy ($70) dollars an hour for out-of-court time and seventy-five ($75) dollars an hour for in-court time, the computation reflected in exhibit 17, as amended, is correct; that the defendants only raise the contested issues as set forth *supra* but argue that there was a waiver, as I have already discussed, and that, in any event, the Court should exercise its discretion, in a reserved manner, so as to reduce the requested award of the plaintiffs.

The contested issues and the waiver have been resolved; "the number of hours reasonably expended" are as proven by the plaintiffs; and rate requested is reasonable. It follows the "lodestar" fee is—

| | |
|---|---|
| For legal services rendered through March 31, 1982 | $43,103.00 |
| For legal services from April 1, 1982 through June 23, 1982 | $7,117.50 |
| 10% pre-judgment bonus for risk of nonpayment | $2,351.00 |
| Total | $52,571.50 |

*Adjustment of "lodestar" fee to reflect the "delay in payment."*

2.

| Year | Quarter of Year | Hours | "OC" = Out of Court Time "IC" = In Court Time | | Hours | Dollars Per Hour | Reducation Pursuant to Stipulation | Pursuant to Stipulations | Net After Reduction |
|---|---|---|---|---|---|---|---|---|---|
| A | B | | | | C | D | E | F | G |
| 1977 IV | | 145 H 25 (OC) | | | 145.4 | 145.4 x 70 = 10,178.00 | -50.00 | | |
| | | 24 H 15 (IC) | | | 24.3 | 24.3 x 75 = 1,822.50 | | | |
| 1978 I | | 23 H 30 (OC) | | | 23.5 | 23.5 x 70 = 1,645.00 | -50.00 | | 11,951.00 |
| | | 14 H 5 (IC) | | | 14.1 | 14.1 x 75 = 1,057.50 | | | |
| | II | 8 H 10 (OC) | | | 8.2 | 8.2 x 70 = 574.00 | -50.00 | -262.30 | 2,652.00 |
| | | 0 H 35 (IC) | | | 0.6 | 0.6 x 75 = 45.00 | -50.00 | | |
| | | | | | | | | | 300.00 |
| | III | 94 H 45 (OC) | | | 94.8 | 94.8 x 70 = 6,636.00 | -50.00 | | |
| | | 0 H 0 (IC) | | | 0.0 | 0.0 x 75 = 0.00 | | | |
| | | | | | | | | | 6,586.00 |
| | IV | 29 H 30 (OC) | | | 29.5 | 29.5 x 70 = 2,065.00 | -50.00 | | |
| | | 0 H 0 (IC) | | | 0.0 | 0.0 x 75 = 0.00 | | | 2,015.00 |
| 1979 I | | 6 H 35 | | | 6.6 | 6.6 x 75 = 495.00 | -55.50 | | 440.00 |
| | II | 13 H 30 | | | 13.5 | 13.5 x 75 = 1,012.50 | | | 957.00 |
| | III | 12 H 25 | | | 12.4 | 12.4 x 75 = 930.00 | -55.50 | | 874.00 |
| | IV | 105 H 55 | | | 105.9 | 105.9 x 75 = 7,942.50 | ÷55.50 | -56.25 | 7,831.00 |
| 1980 I | | 7 H 55 | | | 7.9 | 7.9 x 75 = 592.50 | -55.50 | | 537.00 |
| | II | 13 H 25 | | | 13.4 | 13.4 x 75 = 1,005.00 | -55.50 | | 949.00 |
| | III | 4 H 20 | | | 4.3 | 4.3 x 75 = 322.50 | -55.50 | | 267.00 |
| | IV | 10 H 0 (LL) | 10.0 | | | | | | |
| | | 8 H 36 (JR) | 8.6 | | 18.6 | 18.6 x 75 = 1,395.00 | -55.50 | | 1,340.00 |
| 1981 I | | 7 H 14 (LL) | 7.2 | | | | | | |
| | | 16 H 35 (JR) | 16.7 | | 23.9 | 23.9 x 75 = 1,792.50 | -55.50 | | 1,737.00 |
| | II | 4 H 30 (LL) | 4.5 | | | | | | |
| | | 6 H 48 (JR) | 6.8 | | 11.3 | 11.3 x 75 = 847.50 | -55.50 | | 792.00 |
| | III | 2 H 40 (LL) | 2.7 | | | | | | |
| | | 5 H 54 (JR) | 5.9 | | 8.6 | 8.6 x 75 = 645.00 | -55.50 | | 590.00 |
| | IV | 9 H 50 (LL) | 9.8 | | | | | | |
| | | 10 H 24 (JR) | 10.4 | | 20.2 | 20.2 x 75 = 1,515.00 | -55.50 | | 1,459.00 |
| 1982 I | | 10 H 20 (LL) | 10.3 | | | | | | |
| | | 14 H 28 (JR) | 14.7 | | 25.0 | 25.0 x 75 = 1,875.00 | -55.50 | | 1,820.00 |

TOTAL 611.70 TOTAL: 43,103.00

■ "Delay in payment" warrants an upward adjustment in the "lodestar" figure. *Furtado v. Bishop, supra,* at 920, citing the en banc decision of the D.C. Circuit in *Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir. 1980).

> The delay in receipt of payment for services rendered is an additional factor that may be incorporated into a contingency adjustment. The hourly rates used in the "lodestar" represent the prevailing rate for clients who typically pay their bills promptly. Court-awarded fees normally are received long after the legal services are rendered. That delay can present cash-flow problems for the attorneys. In any event, payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable. A percentage adjustment to reflect the delay in receipt of payment therefore may be appropriate.
>
> *Copeland, supra* at 893 (citation, footnote omitted)

In this case, it appears there was, indeed, a delay on the part of the state. Plaintiffs' exhibit 6 shows that before trial plaintiffs attempted to settle the case; after trial and before briefs were submitted there again was another unsuccessful attempt by plaintiffs to settle the matter. Judgment was entered in favor of the plaintiffs in March 1979 (amended June 1, 1979). Again settlement was discussed without success. Specifically the plaintiff's testimony, as evidenced by her affidavit (Pl.Ex. 6 ¶ 18) entered by agreement, reads

> After trial, but before briefs were prepared, I had further settlement discussions with counsel for defendants, culminating in a chambers conference to establish a tentative briefing schedule. After the entry of judgment in favor of plaintiffs, counsel for defendants and I again discussed resolution of the matter. Prior to filing the within request, I attempted to resolve plaintiffs' fee application informally. On each of these occasions, settlement discussions broke down over the issue of attorneys fees and costs. I was informed that counsel for defendants were unable to obtain authority to agree to pay plaintiffs' counsel fees or costs. It is my understanding that this lack of authority was based upon a policy decision of the State of Rhode Island not to agree to pay counsel fees, in general, in the absence of court order and not upon the particulars of this case.

On May 30, 1979 the fee issue was expressly reserved for determination by the Court.

On December 28, 1979 the First Circuit affirmed the judgment of this Court. At the end of April 1980 the plaintiffs filed the present motion for fees; as the plaintiff's affidavit, *supra,* shows and as I have already pointed out, before filing this motion she again attempted without success to settle the fee issue. Despite additional settlement discussions in November 1981 defendants made no offer to settle until March 1982; this was approximately 4 years after trial, three years after plaintiffs' judgment by this Court and two years after the First Circuit affirmed said judgment.

Finally the defendants were again responsible for delay by seeking a continuance of the fee hearing. Such a continuance was granted over the plaintiff's objection from January 1981 to November 1981. In November defendants again asked the Court to vacate the November 1981 date to explore settlement.

The defendants argue they should not be held responsible for any delay. It is their position that no motion for fees was filed until April of 1980 and that there was no meaningful opportunity to discuss settlement until July 1980 after all of the information on the plaintiff's motion for fees had been filed.

The plaintiff's affidavit stands uncontradicted. It shows quite conclusively that the defendants were not disposed to settle this case and that their non-settlement attitude was a reflection of the state policy to pay only when ordered by the Court. As of December 28, 1979, the date the First Circuit affirmed this Court, the defendants

knew they were unquestionably liable for attorneys' fees and yet it wasn't until March of 1982 that they made an offer.

■ This may be an appropriate case where the Court can look to see whether the defendants had inordinately delayed. I believe that the delay here in and of itself justifies an upward adjustment of the "lodestar" figure. However, the emphasis on the actual delay in payment by the defendants is an unnecessary emphasis. I agree with the plaintiff that the concept of delay in payment does not focus on the date when the amount of attorneys' fee is liquidated but rather the recognition of the policy behind the attorneys' fee-award act to grant the kind of fee that will attract competent counsel; as argued, it recognizes that a case billed on a traditional billing basis results in billing and payments in an expeditious fashion. The focus is not on what the defendants knew or reasonably should have known, but instead on a fair fee concept; "payment today for services rendered long in the past deprives the eventual recipient of the value of the use of money in the meantime, which use, particularly in an inflationary era, is valuable." Simply speaking, we must recognize that there has been a period of time from the rendition of the services to payment of the services, whether it is due to the defendants' conduct or simply to the time it takes to litigate the case; the Court need not look to the conduct of the defendants; it may look to the natural development of events from the time the cause of action arose to the time of payment—in this case it was considerable.

■ An upward adjustment for such delay should be made. The upward adjustment is best accomplished by awarding interest, using a multiplier it believes to be fair. Though this Court is not bound by the State interest rates, it can look to the State statutory law for guidance. In Rhode Island 12% is authorized. R.I.G.L. 9–21–10. See 28 U.S.C. sec. 1961. Morrow v. Finch, 642 F.2d 823 (5th Cir.1980), Cleverly v. Western Electric Co. 450 F.Supp. 507, 512 (W.D.Mo.1978), aff'd, 594 F.2d 638 (8th Cir. 1979).

In analyzing the nature of the interest award, it must be understood that the awarding of interest is in no sense a windfall. Because a dollar today is worth more than a dollar in the future, "the only way [a party] can be made whole is to award him interest from the time he should have received the money. [Citation omitted] Indeed, this case dramatizes the need for interest on attorneys' fees if the attorneys for the prevailing party are to be adequately compensated. Most of the fees at issue in this case were awarded in 1973.

Because of inflation, these awards are worth far less today than they were seven years ago. Had the awards been made in 1973, the attorneys could have been drawing interest on the amount for the last seven years.

Gates v. Collier, 616 F.2d 1268 at 1276 (5th Cir.1980) (the amount of the fees had actually been determined at the time of the original judgment.)

In the factual setting at bar it may be argued that the plaintiffs' entitlement should date from the filing of the complaint in 1977, or from June 1, 1979, the date of this Court's judgment, or December '79 when the First Circuit affirmed.

At trial, the expert offered the alternative of awarding a statutory interest rate to run from the last date of each period in which the services were rendered. This is a fair methodology since in private litigation the services would have been billed when completed. Applying this approach, using exhibit 17 as amended the calculation is as follows:

1. For 11/77 through 1979—II we have $23,950, Pl.Ex. 17. Pl.Ex. 6 time records indicate 4.25 hours out-of-court between 6/1 and 6/20/79 or 297.50 Base figure $23,652.50 Interest to be computed from 6/1/79 to date.

2. For appellate work from 6/1/79 through 1979—IV plus $297.50 for June 1979 $9,002.50 Interest to be computed from January 1, 1980

3. For legal services from January 1, 1980 to present (as supplemented by post-hearing affidavits of Labinger and Roney) at $75 an hour $17,564.50

The Court accepts these figures as set forth by the plaintiff since the defendant in no way challenges the time and nature of work performed. The defense argument goes to the propriety of the award in the amounts as computed. This has been addressed by the Court.

The selection of an interest rate is nothing more than a subjective determination by the Court. I will take the rate of interest being currently paid on U.S. Treasury Bills which is 7.813% (as of November 2, 1982 on 91 days U.S. Treasury Bills) rounded out to 8%.

██ Using the figures set forth *supra*, the delay in payment award is as follows:

$23,652.50 at 8% for period of June 1, 1979 to November 3, 1982: $6,465.00

$9,002.50 at 8% for period of January 1, 1980 to November 3, 1982: 2,640.70

Total: $9,105.70 *

The total award:

$52,571.50, *see* p. 1167, *supra*
 9,105.70 *

$61,677.20 plus costs and disbursements in the amount of $4,363.35.

The plaintiffs will prepare an order in accordance with this Opinion.