**UNITED NUCLEAR CORPORATION**

v.

**Joseph E. CANNON, Director Department of Health of the State of Rhode Island, et al.**

Civ. A. No. 81–0521 S.

United States District Court,
D. Rhode Island.

April 29, 1983.

See also, D.C., 553 F.Supp. 1220.

Deming Sherman, Patricia Zesk, Providence, R.I., for plaintiff.

Donald Elbert, Jr., Sp. Asst. Atty. Gen., Providence, R.I., for Joseph E. Cannon.

Mary Ellen McCabe, Providence, R.I., for Dept. of Health.

## MEMORANDUM

SELYA, District Judge.

This action was originally brought by United Nuclear Corporation ("UNC") to challenge the validity of a statute enacted by the Rhode Island General Assembly, S. 924, P.L.1981, ch. 85 ("S.924") which imposed a $10,000,000. bonding requirement upon plaintiff in an effort to insure adequate decontamination in and around its nuclear facility at Wood River Junction, Charlestown, Rhode Island. Following the granting of partial summary judgment and the issuance of declaratory and injunctive relief in favor of UNC, *United Nuclear Corporation v. Cannon,* 553 F.Supp. 1220 (D.R.I.1982) (*"UNC I"*), the parties were directed to address any remaining issues and to advise the Court as to the mootness thereof. *Id.* at 1236. Subsequently, the parties jointly informed the Court that there was no need for further litigation, and presented to the Court for entry an agreed form of judgment (annexed hereto as Appendix "A"). Paragraphs 5 and 6 thereof dealt with the question of counsel fees and disbursements, a matter entirely *dehors* the scope of the Court's opinion. The judgment was entered on January 28, 1983.

Plaintiff, pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (1976)[1], and to paragraph 6 of the judgment, has now moved for assessment of fees and disbursements. The defendant has objected. Various affidavits have been filed. The Court scheduled an evidentiary hearing for March 22, 1983, at which time plaintiff elected to rest upon its affidavits and related filings, and the defendant elected to rest upon its brief, declining the Court's offer to require the plaintiff to produce its affiants for cross-questioning. Protracted oral argument then ensued. The Court instructed plaintiff's counsel to prepare further affidavits (now of record), and the parties were granted permission to file, on or before April 1, 1983, supplementary briefs if either or both so desired.

## I.

■ The defendant argues with considerable passion that the Court should exercise its discretion under 42 U.S.C. § 1988 and decline to award fees and costs, since (i) the plaintiff is a profitable corporation which (by its counsel's admission) can afford to absorb its litigation expenses, and (ii) the thrust of this suit was essentially private and proprietary. Defendant contends, in effect, that these constitute "special circumstances" which "would render an award unjust." *Newman v. Piggie Park, Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968), *quoted with approval in Burke v. Quiney,* 700 F.2d 767, 771 (1st Cir.1983). *See also Williams v. Miller,* 620 F.2d 199, 202 (8th Cir.1980). There are, however, several problems with this exhortation—despite its obvious appeal to the preservation of the public fisc. First, the defendant (hereinafter sometimes referred to as the "State") consented to the entry of the judgment contemplating a fee award, and has in all likelihood waived any contention to the contrary. *See, Scola v. Boat Frances, R., Inc.,* 618 F.2d 147, 155 (1st Cir.1980). Second, the burden of proof of the required "special circumstances" rests with the defendant, *Crosby v. Bowling,* 683 F.2d 1068, 1072 (7th Cir.1982); *Staten v. Housing Authority,* 638 F.2d 599, 605 n. 13 (3rd Cir.1980); *Williams v. Miller,* 620 F.2d

1. 42 U.S.C. § 1988 provides in pertinent part:
In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. 1681 et seq.], or in any civil action or proceedings, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

at 202; *Mid-Hudson Legal Services, Inc. v. G & U, Inc.,* 578 F.2d 34, 38 (2d Cir.1978), and the defendant has seen fit to offer no extrinsic evidence in support of this thesis. Third, the case law leaves scant doubt but that, in an appropriate case, corporate plaintiffs are entitled to fee awards under § 1988. *See, e.g., Venuti v. Riordan,* 702 F.2d 6, 7 (1st Cir.1983); *International Oceanic Enterprises, Inc. v. Menton,* 614 F.2d 502, 503 (5th Cir.1980).

The First Circuit has flatly rejected any notion that, to be eligible for shifting of counsel fees, a prevailing party must show that his suit was productive of a direct benefit to the public at large, rather than ameliorating only the circumstances of the party himself. *Perez v. University of Puerto Rico,* 600 F.2d 1, 2 (1st Cir.1979), (citing *Zarcone v. Perry,* 581 F.2d 1039, 1042 (2d Cir.1978), *cert. denied,* 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979)). Private citizens, individually or collectively, may assert their civil rights in the § 1983 context. This being so, the sovereign should be no more free unconstitutionally to trample upon the property rights of business entities than upon those of individuals.

The full panoply of this suit, and of its factual predicate, is set forth in *UNC I.* The plaintiff challenged the constitutionality of S. 924 on the following grounds: (i) it constituted a bill of attainder; (ii) it was impermissible *ex post facto* legislation; (iii) it was preempted by the Atomic Energy Act of 1954, as amended, 42 U.S.C. § 2011 *et seq.;* and (iv) it was unconstitutionally vague and thus denied the plaintiff its due process rights. While the plaintiff was not successful on each and every theory proffered, the plaintiff's constitutional rights were implicated sufficiently by the due process astrictions inherent in the offending statute to justify some award of fees pursuant to § 1988.

## II.

Once it is determined that some fees are allowable and should be assessed, two broad questions remain unanswered. First, what work is compensable? Second, what is the fair and reasonable dollar value of such compensable services?

■ The fee request limned in the plaintiff's application and affidavits ($68,365.67) is a prodigious one for a case which was, with a minimum of pre-trial discovery, terminated at a Rule 56 way station. It must be broken down, however, into its component service areas, as the First Circuit has indicated that, as a general rule, fee awards under § 1988 should be granted only for issues which were successfully litigated. *Nadeau v. Helgemoe,* 581 F.2d 275, 279 (1st Cir.1978). In so doing, a district court "must consider the relationship of the claims that resulted in judgment with the claims that were rejected and the contribution, if any, made to success by the investigation and prosecution of the entire case." *Jones v. Diamond,* 636 F.2d 1364, 1382 (5th Cir.) (en banc), *cert. dismissed,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981). The Court compartmentalizes the services here *sub judice* as follows:

1. Work undertaken prior to the enactment of S. 924.
2. Work incident to fending off a putative intervenor.
3. Development of the bill of attainder and *ex post facto* issues.
4. Development of the Supremacy Clause thrust.
5. Work anent due process considerations and all other services germane to prosecution of the litigation.

## III.

■ The statute giving rise to the case at bar was signed into law on May 20, 1981. The plaintiff, however, engaged counsel in advance of that date. At oral argument, this engagement was portrayed as research and related effort in an "attempt to convince the General Assembly of the unconstitutionality of the proposed statute." Although plaintiff's counsel strenuously asserts that these services cannot be characterized as lobbying, this contention, viewed charitably, can best be described as disingenuous. In the Court's opinion, the pre-

litigation expenditure of time, devoted as it was to an attempt to convince the General Assembly of the illegality of its proposed action, was lobbying, pure and simple. While patrolling the legislative halls to head off disadvantageous enactments may be a prudent use of funds by special interests, the cost of such political elbow-rubbing cannot, in the view of this Court, be shifted to the state even where, as here, a bill emerges which does not pass constitutional muster. With the statute not yet adopted and the shape both of the perceived harm and of the eventual instrument thereof entropic at best, none of this time properly should be recompensed under § 1988. *Cf. Venuti v. Riordan, supra,* at 9–10. Not even the most ambitious of the decided cases suggests a contrary result on this point.

### IV.

Subsequent to the institution of this suit, the Conservation Law Foundation ("CLF") sought unsuccessfully to intervene in the litigation. There is no evidence that the defendant incited such intervention; in fact, it took no position. Plaintiff understandably felt constrained to resist intervention, and did so successfully in the district court and before the First Circuit. *United Nuclear Corporation v. Cannon,* 696 F.2d 141 (1st Cir.1982).[2] The Court believes that the reasoning expressed in *Taylor v. Sterrett,* 640 F.2d 663 (5th Cir.1981) is persuasive on this point. In *Taylor,* the Fifth Circuit held that time expended in connection with opposition to intervention was not only irrelevant to the main goal of the primary civil rights litigation there *sub judice,* but also represented a circumstance beyond the defendant's control. *Id.* at 670. The Court then held that the time so expended was not compensable under § 1988. *Id.* So here: whether or not CLF joined

the defendant as UNC's adversary, the dimensions of the constitutional issue remained constant; and there is no evidence that the State collogued with CLF to inspire its intercession. The intervention was collateral and was beyond the defendant's control. The decision to battle against it was essentially a tactical judgment on plaintiff's part for its own ends. The plaintiff attempts to distinguish *Taylor* on the ground that CLF's motion was a dire impediment to the timing of its rush to judgment, but the State, prior to, during and after CLF's attempt to intervene, made no effort to enforce S. 924 *pendente lite.* Moreover, the State would have been immune from assessment of fees had CLF sued UNC in an independent proceeding to which the State was not a party; absent complicity, the result should be no different because CLF elected to employ a different vehicle to assert its perceived interests. The opposition to intervention did not, in the Court's judgment, affect the outcome of this litigation, nor did it materially contribute to the plaintiff's ultimate success on Fourteenth Amendment grounds. This time, too, is properly excludable under § 1988.

### V.

Since the plaintiff at oral argument conceded that the time and effort expended on the unsuccessful pursuit of its bill of attainder and *ex post facto* theories should not be the subject of a § 1988 compensation award in this case, nothing more need be said on this point; the fact of the concession will simply be noted for the record.[3]

### VI.

The Court turns next to compensability of the time spent on the Supremacy Clause issue. The plaintiff succeeded in an effort

---

**2.** The nature and circumstances of the attempted intervention are adequately described in the opinion of the First Circuit and do not warrant repetition here.

**3.** Indeed, this concession recognizes the majority rule which holds that time must be apportioned between meritorious and unmeritorious

claims. *E.g., Robinson v. Kimbrough,* 652 F.2d 458, 467 (5th Cir.1981); *Nadeau v. Helgemoe,* 581 F.2d at 279. Pursuit of these issues did not contribute "to success ... [in the] prosecution of the entire case". *Jones v. Diamond,* 636 F.2d at 1382.

to strike down S. 924 on the basis, *inter alia,* that the statute was preempted by the Atomic Energy Act of 1954, as amended, 42 U.S.C. § 2011 *et seq.,* and the regulations promulgated thereunder. The plaintiff now argues that passage of S. 924 infringed on its constitutional rights by reason of this preemption; and that, therefore, it is entitled to attorneys' fees under § 1988 for services rendered on this issue. The State, however, maintains that time expended on the Supremacy Clause battleground should not be encompassed within a fee award because that claim does not fall within the target area of those causes of action which trigger the § 1988 blunderbuss. Plaintiff cites a string of authority, the linchpin of which is *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), in support of its asseveration that fees may be awarded to prevailing parties under § 1988 for successful advancement of claims based on statutory violations and concludes that: "[U]nder *Thiboutot,* therefore, plaintiff has a claim under § 1983 based *solely* on preemption and it may recover attorneys' fees for prevailing thereon." Plaintiff's Supplementary Memorandum at 2.

The Court believes that this reliance on *Thiboutot* is misplaced. The Supreme Court has held that the Supremacy Clause is not a constitutional provision which secures rights within the meaning of 28 U.S.C. § 1343(3). *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 612–15, 99 S.Ct. 1905, 1913–14, 60 L.Ed.2d 508 (1979).

Since § 1343(3) and 42 U.S.C. § 1983 are direct descendants of § 1 of the Civil Rights Act of 1871, *Lynch v. Household Finance Corp.,* 405 U.S. 538, 543 n. 7, 92 S.Ct. 1113, 1117 n. 7, 31 L.Ed.2d 424, they are to be construed *in pari materia. Id.* It would be anomalous indeed for this Court to hold that the Supremacy Clause secures rights under § 1983 and does not secure rights under § 1343(3). Constrained both by logic and by precedent, this Court must conclude that the assertion of a Supremacy Clause claim is not cognizable under 42 U.S.C. § 1983. *Cf. Consolidated Freight-*

*ways Corp. v. Kassel,* 556 F.Supp. 740, 748–749 (S.D.Iowa 1983) (Commerce Clause). The Court holds, therefore, that the time spent on Supremacy Clause work in this case does not, under § 1988, sow the seeds for an ensuing fee harvest.

This holding is not at variance with *Thiboutot,* for whereas the Supreme Court has there recognized, as plaintiff contends, that the phrase "rights, privileges or immunities secured by the ... laws" of the United States as used in § 1983 is not limited to a subset of stereotypical civil rights legislation, 448 U.S. at 5, 100 S.Ct. at 2504, it has also unhesitatingly acknowledged that not all laws secure rights within the scope of § 1983, notwithstanding the fact that individuals may benefit therefrom. *See, e.g., Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 19, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981); *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981). *See also Smith v. Cumberland School Committee,* 703 F.2d 4, 7–9 (1st Cir.1983); *Consolidated Freightways Corp. v. Kassel, supra,* at 744–745. When questioned by the Court at the March 22 hearing, even plaintiff's counsel admitted that, were a Supremacy Clause claim to be presented alone, it would in all likelihood not suffice to invoke the anodyne of § 1983. If § 1983 is unavailable, it follows necessarily, as the night the day, that the lush green pastures of § 1988 are likewise foreclosed. *Maher v. Gagne,* 448 U.S. 122, 129 n. 11, 100 S.Ct. 2570, 2574 n. 11, 65 L.Ed.2d 653 (1980).

Such a holding, too, is consistent with the excellent analysis set forth by Professor Choper, in manner following:

When a litigant contends that the national government (usually the Congress, but occasionally the executive, either alone or in concert with the Senate) has engaged in activity beyond its delegated authority, or when it is alleged that an attempted state regulation intrudes into an area of exclusively national concern, the constitutional issue is wholly different from that posed by an assertion that certain

government action abridges a personal liberty secured by the Constitution. The essence of a claim of the latter type—which falls into the individual rights category of constitutional issues . . .—is that no organ of government, national or state, may undertake the challenged activity. In contrast, when a person alleges that one of the federalism provisions of the Constitution has been violated, he implicitly concedes that one of the two levels of government—national or state—has power to engage in the questioned conduct. The core of the argument is simply that the particular government that has acted is the constitutionally improper one. To put it another way, a federalism attack on conduct of the national government contends that only the states may so act; a federalism challenge to a state practice asserts that only the central government possesses the exerted power; neither claim denies government power altogether.

J. Choper, *Judicial Review in the National Political Process,* 174–75 (1980), *quoted with approbation in Consolidated Freightways Corp. v. Kassel, supra,* at 746.

### VII.

■ In addition to its victory on the merits of the Supremacy Clause claim, however, plaintiff successfully invalidated S. 924 on vagueness grounds as well, thereby bringing into play the Fourteenth Amendment. The services rendered in this respect are in the classic § 1983 mold. Thus, since those legal services center principally about the due process claims, they are, in the Court's judgment, suitable grist for the § 1988 mill. Such remaining effort comprises legal research, time spent in protracted (albeit bootless) negotiations, court attendance and the like.

■ Fee awards in the First Circuit must conform to the guidelines lucidly set forth in *Furtado v. Bishop,* 635 F.2d 915 (1st Cir.1980). *Furtado* demands, as the focal point in the endeavor, computation of a lodestar figure. *Id.* at 920. Determination of the lodestar entails, in turn, consideration of a dozen factors which often shed light upon the calibre and value of the legal work in question.

These elements are:

1. The time and labor required.
2. The novelty and difficulty of the question(s) presented.
3. The skill required to perform the legal services.
4. The preclusion of other employment (if any) by the attorney(s) due to acceptance and prosecution of the case.
5. Customary fees in the community.
6. The nature of the fee arrangements by which counsel was retained (*e.g.,* whether fixed or contingent).
7. Time limitations (if any) imposed by the client(s) or by the attendant circumstances.
8. The amount involved and the results obtained.
9. The experience, reputation and ability of counsel for the prevailing party.
10. The undesirability of the case.
11. The nature and length of the professional relationship with the client(s).
12. Fee awards in similar cases.

*King v. Greenblatt,* 560 F.2d 1024, 1026–27 (1st Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978) (citing *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974)).

In the case at bar, the questions presented[4] had some flavor of novelty; but, of the banquet of issues before the Court, the due process claim was the most bland. On this issue, the employment cannot be regarded as especially difficult, given the glaring inadequacies of S. 924. Nevertheless, the case was of grave import to the client; the stakes were high; and the engagement permitted of scant margin for error. There were, however, no exigent circumstances which superimposed unorthodox litigation

---

**4.** As indicated above, the Court's consideration and discussion of these points in this Part VII is limited to the due process issues and related effort which have been described as compensable under the findings enunciated *ante.*

procedures or taxing time constraints upon the litigators. Counsel for the plaintiff are able and well-regarded. Their firm (Edwards & Angell) has regularly represented UNC for almost two decades as local counsel in Rhode Island. The case was a rainmaker's dream: an important piece of litigation, an affluent client, odds-on prospects for success, time billings at undiscounted hourly rates, an absence of significant litigation budgetary constraints, and a hook into § 1988 fee-shifting. UNC would have found few (if any) Rhode Island law firms unwilling to throw down this particular gauntlet. The case could not fairly be characterized as undesirable in any way; counsel ran no risk either of impoverishment or of incurring public obloquy by reason of acceptance of the engagement. Counsel's participation was bound to be profitable; the fee was on a pay-as-you-go basis, at counsel's regular billing rates. Similarly, there was no preclusion from other employment. The work was performed competently and an excellent (but wholly predictable) result was obtained.

Balancing all of these factors, counsel for the plaintiff has acknowledged that this is a case which calls for no upward adjustment in the lodestar fee, once that fee is calculated. The defendant argues that the lodestar should be recycled downward. Applying the analytic modalities suggested by *Furtado v. Bishop,* 635 F.2d at 620, the Court's calibration of the findings results in a sense of libration: the lodestar, when computed, need not be adjusted.

This leaves, then, the judicial tamisage necessary to construct the lodestar. The recipe is as follows:

This would involve separating out work done in relation to a firm's hierarchy, from senior partner to junior associate (and, we would add, including work that was or ought to have been assigned to a non-lawyer); eliminating time beyond that consistent with a standard of reasonable efficiency and productivity; and, after receiving documentation and possibly holding a hearing, assigning appropriate hourly rates for the kinds of work done by those at different levels of expertise. This results in a "lodestar" fee that then is adjusted upward or downward to reflect the contingent nature of any fee (if such is not reflected in the hourly rate), delay in payment, quality of representation (i.e., an unusually good or poor performance above or below the skill already reflected in the hourly rates), exceptional (and unexpected) results obtained, etc.

*Furtado v. Bishop,* 635 F.2d at 920 (footnote omitted); *see also Copeland v. Marshall,* 641 F.2d 880, 891–92 (D.C.Cir.1980) (en banc). The Court has indicated *ante* the basis on which it will separate out generically non-compensable effort. The plaintiff has furnished detailed time-and-hours data, indicating the total devotion of time per lawyer. The Court will extrapolate from this data in the manner shown on Appendix "B."

Within the category of presumptively non-excluded time (labelled "Remaining Time" in Appendix "B"), some problems still lurk.[5] The Court will, however, first address the matter of hourly rates. In designing a fee structure, the Court has considered customary fees in the community throughout (recognizing, however, that such fees, on average, are somewhat less than

---

**5.** "Remaining Time" includes not only time directly attributed by plaintiff's counsel to the due process issue, but also all other time not specifically accounted for in any other category, "but related in general to the prosecution of the litigation". Supplementary Affidavit of Deming E. Sherman at 2. ("Supplementary Sherman Affidavit"). The Court notes, after perscrutation of the time sheets and computer records, that this miscellaneous category includes not only work germane to the § 1983 claim, such as settlement negotiations, but also includes work of much more attenuated rele-

vance. For example, there reposes within this category legal research anent the availability of a common law nuisance claim, discussions with the Governor's Executive Counsel, actions involving a challenge to zoning strictures of the town of Charlestown (originally a part of this suit, *see UNC I,* 553 F.Supp. at 1224 n. 1), and discussions with the media. *See* text and note 7, *post,* for the Court's solution to the problem of the admixture of compensable and non-compensable time included in the miscellaneous category.

those regularly charged by Edwards & Angell, which is Rhode Island's largest law firm—and one with an overhead to match).

Attorney Sherman was lead counsel during this litigation. He is a veteran litigator, having practiced in the federal courts for some 15 years. Nevertheless, the rate requested by Mr. Sherman ($120.00 per hour) appears excessive under the circumstances. This is a case which required first-rate representation, but no exotic expertise. A rate of $95.00 per hour for his time would, in the Court's judgment, be appropriate.

Ms. Zesk is an extremely able advocate, but her admission to the bar dates back only to 1978. The same holds true for both Messrs. Meredith and Mayer. While the requested rate of $75.00 per hour may be reasonable for in-court work, it seems excessive, given the staffing and circumstances of this litigation, when applied across the board. Consistency is important in fee awards within the district; and the Court notes the application by Senior Judge Pettine of rates of $75.00 per hour in-court and $70.00 per hour for out-of-court time by an attorney of roughly equivalent tenure *acting as lead counsel* in a complex class action prison suit raising important First Amendment issues. *Brule v. Southworth,* 552 F.Supp. 1157, 1161–62 (D.R.I.1982). *See also Lamphere v. Brown University,* No. 75–140, slip op. at 15–18 (D.R.I. Feb. 22, 1979), *aff'd* 610 F.2d 46 (1st Cir.1979); *Palmigiano v. Garrahy,* 466 F.Supp. 732, 739–43 (D.R.I.1979), *aff'd* 616 F.2d 598 (1st Cir. 1980). There was a comparative dearth of in-court time devoted to this litigation (none by Meredith or Mayer); and none of the three attorneys in question pulled a leading oar. Under the circumstances, a rate of $70.00/hour will be allowed for Ms. Zesk (who participated in what court proceedings there were, and who ranks as "second banana" in this troupe); and a rate of $65.00/hour will be allowed for Messrs.

Meredith and Mayer, respectively. Ms. Dell and Ms. Heller-Schaber are relative newcomers to the bar; in each instance, the requested rate of $40.00 per hour appears appropriate.

The plaintiff has fixed a rate of $30.00 per hour for law clerks (i.e., law students working during summer intervals) and for paralegals.

While the defendant contests the propriety *per se* of awards for the time and efforts of non-lawyers, the heavy weight of modern § 1988 authority is to the contrary. *See, e.g., Suzuki v. Yuen,* 678 F.2d 761, 763–64 (9th Cir.1982); *Foster v. Gloucester County Board,* 465 F.Supp. 293, 299 n. 5 (D.N.J. 1978); *see also Berman v. Schweiker,* 531 F.Supp. 1149, 1154 (N.D.Ill.1982); *Bolden v. Pennsylvania State Police,* 491 F.Supp. 958, 965 (E.D.Pa.1980). *But see Scheriff v. Beck,* 452 F.Supp. 1254, 1261 (D.Colo.1978). The First Circuit has left no doubt but that it shares this view; in *Furtado v. Bishop,* 635 F.2d at 920, the Court of Appeals described the function of the district courts under § 1988 as a process involving "separating out work done in relation to a firm's hierarchy from senior partner to junior associate (and ... *including work that was or ought to have been assigned to a non-lawyer*)". (Emphasis added). *Cf. Pilkington v. Bevilacqua,* 522 F.Supp. 906, 911–912 (D.R.I.1981). This is both good law and good common sense, given the realities of the marketplace and of modern, progressive law office management.

■ The Court's decision that recompense can be awarded for non-lawyer services is not, however, dispositive of this issue. The rates requested appear to the Court to be rapacious in nature. Even the affidavits of plaintiff's outside experts do not support these price-tags. The Court will fix a rate of $25.00/hour for law clerks and $15.00/hour for paralegals.[6]

---

6. Although this stipend is significantly less than requested, it is in line with fees for paralegals awarded in other instances in this district. *See, e.g., Lamphere v. Brown University,* No. 75–140, slip op. at 22–23 (D.R.I. Feb. 22, 1979),

*aff'd* 610 F.2d 46 (1st Cir.1979). The defendant's suggestion that paralegals be compensated at a rate of $3.00–$4.00 per hour (if at all) is totally unrealistic, and reflects either complete disregard of economic reality or a hidden

In applying the rates so stipulated to compensable time, the Court is not bound by the raw compilations contained in Appendix "B", especially in view of the heterogeneous nature of the issue mix and the myriad personnel assigned by Edwards & Angell to the matter. Rather, the Court must inquire into the reasonableness of the time spent, "eliminating time beyond that consistent with a standard of reasonable efficiency and productivity." *Furtado v. Bishop,* 635 F.2d at 920. In so doing, the Court must zealously guard against any propensity to over-staff litigation; fairness must be the hallmark of § 1988 fee awards.

As lead counsel, Mr. Sherman's total "remaining time" (71.45 hours) should be discounted appropriately for non-related general work, but is otherwise eminently fair, reasonable, justifiable, and compensable. The Court has set 15% as a suitable omnibus discount on "remaining time," for reasons explained in the margin.[7] 60.7 hours are, therefore, allowed.

As second counsel, Ms. Zesk's overall time expended strikes the Court as higher than one ordinarily would expect; but what is more troubling to the Court is the apparent imbalance between time allocated to non-compensable services and time allocated to more clearly compensable services. Well over 50% of her total time is, in effect, charged against the due process aspect of this litigation.[8] Bearing in mind that, in the Court's view, the excluded Supremacy Clause issue presented a knottier, more novel legal conundrum than the relatively straightforward vagueness claim, the Court finds that her time should be reallocated; and further finds that 108.6 hours (net of the omnibus discount) constitutes her necessary and reasonable time commitment to non-excluded issues.[9]

As to Messrs. Meredith and Mayer, categorization of their time plainly indicates that the primary involvement of both attorneys was during the interdicted pre-enactment stage. None of their time was specifically alloted in the Supplementary Sherman Affidavit to the due process claim.[10] The Court, upon review of the time records, simply cannot justify assessing their "remaining time" against the defendant under all of the circumstances. In the case of these two attorneys collectively, after appli-

yearning for the return of bygone days. Furthermore, the Court would have been willing to compensate paralegals (and for that matter law clerks) at graduated hourly rates if plaintiff's counsel had offered any evidence as to the expertise or experience of the various paralegals assigned to the case. *See id.* at 25; *see also Suzuki v. Yuen,* 678 F.2d at 763. No such evidence being of record, the Court has assumed only average levels of experience, training and competence.

7. In focusing on the time not specifically excluded, i.e., on hours within the "Remaining Time" column, the Court has in all instances used a discount figure of 15%. This discount is not a downward adjustment in the lodestar, but represents the Court's best judgment as to how best to purify the remaining time by filtering out from the fee award non-compensable items subsumed within the "Remaining Time" column. In so doing, the Court has recognized that some time, *e.g.,* court appearances, related to most if not all issues; in such instances, the Court's formula in effect allows such time without fractionalization, as the court appearance would presumably, in the example given, have been required even if the plaintiff was proceeding solely on Fourteenth Amendment grounds.

This off-set will be hereinafter sometimes referred to as the "omnibus discount".

8. Plaintiff's allocation of Ms. Zesk's time to the due process claim strikes the Court as odd for another reason. Counsel asserts that Mr. Sherman drafted the vagueness portion of the motion for summary judgment and of the brief in support thereof. Plaintiff's Memorandum at 13. If that be the case, the Court finds it difficult to understand how Ms. Zesk's time could be allocated so heavily in favor of an issue for which she was not directly responsible in the conduct of the litigation.

9. The realignment of time in this and other instances is not intended in any way to impugn plaintiff's counsel. They have been candid with the Court, and their integrity is beyond cavil. Nevertheless, the intricate proration of time required in this case inexorably leads to judgment calls. Reasonable minds may differ; but where they do, it is the Court's findings which control.

10. Once past the lead counsel and the second counsel, moreover, staffing begins to appear less than lean given the parameters and posture of the litigation.

cation of the omnibus discount, the Court will permit recovery for an aggregate total of 8.50 hours only.

Much the same can be said of Ms. Dell, except that it was the excluded bill of attainder and *ex post facto* issues which, in the main, occupied her attention. The Court can, in good conscience, sanction no recovery as to her time charges.[11]

With regard to Ms. Heller-Schaber, her time involvement is of a general nature, and appears quite diffuse. Encouragement should be given to the utilization of junior associates for suitable tasks. This seems to be the case here. Thus, her remaining time (15.70 hours) is allowed, subject to the omnibus discount, for net allowable time of 13.35 hours.

The included hours assigned to summer clerks boggle the mind, given the full panoply of the case. The aberrational nature of this claim is particularly vivid as a mere 5.58 hours (out of a total of 181.00 hours in the remaining time classification) are devoted directly and incontrovertibly to the due process claim. A sound summer clerkship program is valuable both to a large law firm and to the paracletes enrolled therein, and Edwards & Angell maintains one which has been admired for many years in Rhode Island. Nevertheless, it is the firm—not the defendant—which should bear the principal cost of a program, which, in the short run, is designed not to meet immediate client needs, but to burnish the firm's allure and to enhance its position in the recruiting wars which rage with mounting ferocity as legal education progresses toward graduation and permanent employment. After considerable examination of the records, the Court finds that a maximum of 35.33 hours,

net of the omnibus discount, is reasonably includible in respect to the law clerks.

Judicious paralegal utilization, like utilization of junior associates, should also be encouraged. The Court's review of the data indicates that the remainder of the request for paralegal time should be honored, subject to the same omnibus discount applicable to lawyers' time. Thus, 19.1 hours of compensable time is permitted for paralegals.

To recapitulate, therefore, the Court finds that the lodestar (to which there will be, in this case, no adjustment, *see* text, *ante* ) should be computed as follows:

| Individual(s) | Time (Hrs) | Rate/Hr. |
| --- | --- | --- |
| Sherman | 60.7 | $95. |
| Zesk | 108.6 | 70. |
| Mayer/Meredith | 8.5 | 65. |
| Heller–Schaber | 13.35 | 40. |
| Law Clerks | 35.33 | 25. |
| Paralegals | 19.1 | 15. |

The lodestar fee is, therefore, *$15,404.75.* The plaintiff has not sought an interest add-on for delay in payment; therefore, none is awarded in this case.[12]

## VIII.

As to the expense items claimed, the Court is aware of the general rule that reasonable out-of-pocket expenditures, beyond normal overhead, should be included in the award. *Dowdell v. City of Apopka,* 698 F.2d 1181, 1191–92 (11th Cir.1983). Although the Court has been unable to find any authority directly in point anent the recoverability of computer charges for the use of computer-aided legal research systems,[13] this Court believes that such charges should be recoverable in certain cases. Lexis is an essential tool of a modern, effi-

---

**11.** This also is in line with plaintiff's concession that it does not seek fees for work performed on the bill of attainder or *ex post facto* issues. *See* text *ante.*

**12.** In any event, the lawyers were paid in a timely fashion. While not clear, it would appear that the fundamental purposes of § 1988 do not support an interest increment in cases where there has been seasonable interim payment of fees to counsel, despite the fact that

the client (who presumably will be reimbursed) has indeed advanced the funds.

**13.** There are several such computer systems now available. The plaintiff here subscribed to, and used, a well-known, well-regarded system known familiarly as "Lexis". That trade name will be used by the Court hereafter, but the rationale of the Court applies with equal force to all such recognized and accepted systems.

cient law office. As such, it saves lawyers' time by increasing the efficacy of legal research. Denial of reimbursement for Lexis charges in a proper case would be an open invitation to law firms to use high-priced attorney time to perform routine research tasks that can be accomplished quicker and more economically with Lexis. This, in turn, would lead inevitably to increased staffing of civil rights cases, and thus to larger fee awards. The Court will, therefore, treat Lexis charges as other cost items in the case.

The plaintiff has proffered the following tabulation of disbursements:

| | |
|---|---|
| Xerox | $ 933.66 |
| Telephone | 629.62 |
| Postage | 90.87 |
| Lexis Research | 1,611.09 |
| Transcript | 10.00 |
| Travel | 27.00 |
| Miscellaneous | 56.06 |
| Service | 9.72 |
| | $3,368.02 |

This appears to be an entirely legitimate cost-accounting, but it must be redacted to reflect and deduct expenditures allocable to non-compensable services. While there are admitted difficulties in bifurcating these expenses as between covered and non-covered items, the Court believes that an allowance of 30% of the total costs, or $1,347.21 would constitute a fair figure for inclusion ancillary to the fee award.

## IX.

Fee applications under 42 U.S.C. § 1988 and kindred statutes have become a burgeoning form of satellite litigation in the federal courts. Fee-award statutes, in the main, have a two-fold objective: to insure access to the courts in deserving cases, and to guard against excesses of conduct or power. § 1988 is typical, in a sense, of such legislation. It was enacted in the hope of establishing an efficacious private enforcement mechanism "to vindicate the important Congressional policies" underlying civil rights laws, S.Rep. No. 94–1011, 94th Cong., 2d Sess. 2, *reprinted in* (1976) U.S.Code Cong. & Admin.News 5908, 5910, and the same sort of concerns, albeit with respect to different rights, have served as the stimuli for the promulgation of sister statutes.[14] The fear has been that, "if unsuccessful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to [invoke the] powers of the federal courts." *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. at 402, 88 S.Ct. at 966.

The principle of just recompense as an incentive to lawyers in bringing about the legitimate fulfillment of constitutional and/or statutory mandates is a salutary one. There have been many meritorious cases brought under § 1983 which, without the implicit promise of § 1988, might never have been maintained. In such cases, the quintessential objectives of the legislation are met. But, the counsel fee tail cannot be permitted to wag the client's dog. There are storm clouds on the horizon which suggest that there may be a developing inclination on the part of the organized bar to view such statutes as a road-map to a perceived pot of gold at the end of the court-

---

**14.** *E.g.,* 2 U.S.C. § 396 (Federal Contested Elections Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 5 U.S.C. § 552a(g)(2)(B) (Privacy Act); 5 U.S.C. § 552b(i) (Government in the Sunshine Act); 15 U.S.C. § 1640(a) (Truth in Lending Act); 15 U.S.C. § 1667b(a) (Consumer Leasing Act of 1976); 29 U.S.C. § 216(b) (Fair Labor Standards Act). Mind-bending as it may seem, there are upwards of seventy-five separate federal statutes currently in effect wherein Congress has authorized fee-shifting. *See* Berger, *Court Awarded Attorneys' Fees: What Is "Reasonable"?,* 126 U.Pa. L.Rev. 281, 303–04 n. 104 (enumerating stat-

utes). *See also Gates v. Collier,* 616 F.2d 1268, 1277–78 n. 14 (5th Cir.1980). While our traditional justice system once recognized very limited exceptions to the so-called "American Rule" against fee-shifting, *see Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), and while the "American Rule" remains the rule in this Circuit in the absence of express statutory authority, *see Smith v. Cumberland School Committee, supra,* at 7, the rule has been etiolated to a significant extent by the proliferation of Congressional edicts empowering (or in some cases prescribing) fee awards.

room rainbow.[15] Any such auxetic tendency to nourish litigation for the cardinal sake of fee generation must be stopped in its tracks. Should the scales tip in this direction, counsel fees will become the *raison d'etre* for suits; the good intentions of the Congress will be distorted beyond recognition; and, if the Court may be permitted to mix zoological metaphors, the bar's cart will figuratively be placed before the public's horse.

While the benefices of the legislative purpose underlying such fee-award laws may be laudable, the potential for abuse represents a clear and present danger; and the need for strict monitoring and for accipitrine vigilance on the part of *nisi prius* courts is self-evident. This Court intends to require scrupulous adherence to these precepts, providing a judicial counter-weight to ensure that the calipers of justice remain in equipoise.

Counsel for the plaintiff shall prepare and present to the Court for entry an order awarding fees and costs, consonant with the foregoing. Such order shall include a provision mandating payment of the award by the defendant within thirty days next following the date of entry thereof; and shall further provide that, to the extent that the client has heretofore paid all of the fees and costs in question, the amounts herein awarded shall forthwith be tendered to UNC as reimbursement for its periodic fee payments on account. *Sargeant v. Sharp,* 579 F.2d 645, 648–49 (1st Cir.1978).

## APPENDIX A

### JUDGMENT

This matter was submitted to the Court on Cross-Motions for Partial Summary Judgment with regard to plaintiff United Nuclear Corporation's Complaint for Declaratory Judgment and Other Relief with respect to S. 924, entitled "An Act Relating to Radioactive Contamination", which stat-ute was enacted by the Rhode Island General Assembly on May 20, 1981. In accordance with the conclusions of law contained in the Opinion and Order of the Court issued on December 13, 1982 by Selya, D.J., it is hereby ORDERED and ADJUDGED as follows:

1. Subject matter jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331, 1332, 1343(a)(3), 2201, and 2202.

2. Plaintiff's Motion for Partial Summary Judgment is granted as to Counts I and V of the Complaint, and defendant's Motion for Partial Summary Judgment is granted as to Counts II and III of the Complaint. All other counts are moot and, therefore, are dismissed.

3. S. 924, entitled "An Act Relating to Radioactive Contamination", which statute was enacted by the Rhode Island General Assembly on May 20, 1981, is hereby declared to be unconstitutional, both on its face and as applied to plaintiff United Nuclear Corporation, because it violates both the Supremacy Clause and the Fourteenth Amendment of the United States Constitution.

4. Defendants Joseph E. Cannon, M.D., D.P.H., in his capacity as Director of the Department of Health of the State of Rhode Island, Dennis J. Roberts II, in his capacity as Attorney General of the State of Rhode Island, and J. Joseph Garrahy, in his capacity as Governor of the State of Rhode Island are permanently restrained and enjoined from enforcing the said S. 924 and/or from acting or threatening to act thereunder, and/or from attempting, directly or indirectly, to secure or insist upon compliance therewith.

5. Because this action included a substantial claim to enforce a provision

---

**15.** There is no suggestion by the Court that this sort of thinking has captured the minds and hearts of plaintiff's counsel in the instant action.

APPENDIX A—Continued

of 42 U.S.C. § 1983, which claim arose out of a common nucleus of operative facts with the claims that form the basis for this Court's declaration that S. 924 is unconstitutional, plaintiff United Nuclear Corporation is entitled to its reasonable attorneys' fees as part of the costs of this action pursuant to 42 U.S.C. § 1988.

6. Plaintiff United Nuclear Corporation may submit a Motion for Attorneys' Fees and Costs within thirty (30) days of the entry hereof, or, in the event of appeal, within thirty (30) days of the entry of the mandate by the First Circuit Court of Appeals.

ENTERED as the Judgment of this Court this 28 day of January, 1983.

## APPENDIX B

| Individual | Total Time (Hrs) | Pre-Enactment Time (Hrs) | Bill of Attainder and Ex Post Facto (Hrs) | Intervention (Hrs) | Supremacy Clause (Hrs) | Remaining Time (Hrs) |
|---|---|---|---|---|---|---|
| Atty Sherman | 105.72 | 0.00 | 6.13 | 19.64 | 8.50 | 71.45 |
| Atty Zesk | 419.32 | 5.88 | 6.75 | 122.16 | 63.35 | 221.18 |
| Atty Meredith | 101.00 | 57.45 | 1.50 | 0.00 | 0.00 | 42.05 |
| Atty Mayer | 30.75 | 18.06 | 0.00 | 0.00 | 0.00 | 12.69 |
| Atty Dell | 27.75 | 0.00 | 22.75 | 0.00 | 0.00 | 5.0 |
| Atty Heller–Schaber | 15.70 | 0.00 | 0.00 | 0.00 | 0.00 | 15.70 |
| Summer Law Clerks (collectively) | 261.40 | 0.00 | 38.50 | 41.90 | 0.00 | 181.00 |
| Paralegals (collectively) | 46.70 | 0.00 | .50 | 12.83 | 10.85 | 22.50 |

Note: Compilation is based upon figures and allocations submitted by counsel for the plaintiff, prior to the exercise of judicial oversight.